Dawn HORTON, Plaintiff,

v.

AMERICAN RAILCAR INDUSTRIES,
INC., Defendant.

No. 3:01CV00310 GH.

United States District Court,
E.D. Arkansas,
Jonesboro Division.

July 23, 2002.

Larry J. Steele, Walnut Ridge, AR, for plaintiff.

Timothy J. Sarsfield, Timm W. Schowalter, Thompson Coburn LLP, St. Louis, MO, Randy F. Philhours, Branch, Thompson, Philhours & Warmath, Paragould, AR, for defendant.

## ORDER

GEORGE HOWARD, Jr., District Judge.

Plaintiff filed suit on September 24th under Title VII alleging that she was terminated on September 28, 2000, because she was pregnant. Defendant filed a motion to dismiss or, alternatively, for summary judgment on November 8th. The motion was supported by brief, exhibits and a separate statement of undisputed facts. Plaintiff responded on November 30th with brief, exhibits and a controverting statement. On December 10th, defendant filed a reply with exhibits.

Summary judgment can properly be entered when there are no genuine material facts that can be resolved by a finder of fact; that is, there are no facts which could reasonably be resolved in favor of either party. The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). The non-moving party may not just rest upon his or her pleadings, but

must set forth specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Civil Procedure Rule 56. "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather the dispute must be outcome determinative under prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir.1989).

The case of *Jackson v. Arkansas Dept. of Educ., Vocational and Technical Educ. Div.*, 272 F.3d 1020, 1025 (8th Cir.2001) explains further:

> As the nonmoving party, Jackson bears the burden "of presenting evidence sufficiently supporting disputed material facts that a reasonable jury could return a verdict in [her] favor." *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir.1992).

Earlier, in *P.H. v. School Dist. of Kansas City, Missouri*, 265 F.3d 653, 658 (8th Cir.2001), the appellate court provided the following guidance in assessing a summary judgment motion:

> "To avoid summary judgment, the non-movant must make a sufficient showing on every essential element of its claim on which it bears the burden of proof." *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 718 (8th Cir.2000), *cert. denied*, 531 U.S. 1077, 121 S.Ct. 773, 148 L.Ed.2d 672 (2001).

> \*     \*     \*     \*     \*     \*

> P.H., as the nonmoving party, "is entitled to all reasonable inferences—those that can be drawn from the evidence without resort to speculation." *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1110 (8th Cir. 2001) (internal quotations omitted).

Local Rule 56.1 provides that a party moving for summary judgment must file a separate, short and concise statement of material facts as to which it contends there is no genuine issue to be tried. The rule further provides that unless the non-moving party files a separate, short and concise statement of the material facts as to which it contends a genuine issue exists to be tried, all material facts set forth in the moving party's statement will be deemed admitted.

As plaintiff has specifically disputed five of the facts contained in defendant's statement, the remaining facts set out below that were not disputed are deemed admitted:

1.   ARI has a plant in Paragould, Arkansas that manufactures and paints hopper cars.

4.   On April 20, 2000, Horton was hired as a weld trainee and assigned to the ARI's formal weld training program at its Paragould facility.

5.   Horton completed her weld training and on May 1, 2000 was assigned to welder duties at ARI's Paragould facility

7.   On June 5, 2000, Ms. Horton resigned her employment.

8.   Later that summer, Ms. Horton inquired into re-employment.

9.   On August 8, 2000, Ms. Horton was re-hired as a welder and was assigned to a welder position at ARI's Paragould facility.

10.   As a welder, Horton was required to perform a variety of manual tasks. For the most part, however, Horton's duties were restricted to ladders and brakes. Specifically, Horton was required to operate high powered Huck Bolt Guns (weighing between 5 to 12 pounds) to fasten Huck bolts (approx. 4 to 5 inches) to large steel ladders. Upon completion of that task, Horton was required to climb a ladder

and blowtorch holes in the side of a tank truck for the attachment of the steel ladder. Thereafter, Horton would lift the ladder with a crane, align the bolts attached to the ladder with the blowholes, and then fit and bolt the ladder to the tank truck.

11. In September of 2000, Horton's physical appearance made it evident that she was pregnant. Horton satisfactorily performed her job duties without incident until September 27, 2000.

12. On September 27, 2000, Horton complained to her direct supervisor Lance Winford that her pregnancy was making it difficult for her to perform all of her required job duties. The next day, Horton told her former supervisor Sonny Haley that she was having difficulty performing her job duties. Later that day, Horton provided Plant Superintendent Tom Hazelwood with a doctor's note that recommended light duty.

13. Horton's physician, Dr. Norman Smith, restricted Ms. Horton's duties as follows: "Pl is pregnant and due to change in balance and other changes in pregnancy *I recommend light duty*—avoid lifting over 10 lbs–15lbs/climbing ladders, straining, etc."

14. Mr. Hazelwood informed Horton that they needed to discuss the issue with Dennis Cooper Human Resource Manager and Dean Inman Senior Human Resources Manager.

15. Mr. Inman and Dennis Cooper met with Horton to discuss her request for a modified work assignment. During this meeting, Horton was advised that modified work assignments, *i.e.*, light duty work, are *only* available to employees that have sustained an occupational injury or illness. Horton was also advised that ARI has consistently denied light duty work assignments to employees that have sustained a non-occupational injury or illness. Horton was also reminded of ARI policies and practices that prohibit a leave of absence within an employee's initial ninety (90) days of employment.

■ Defendant first argues that while plaintiff has pleaded and proven that she was pregnant and was denied a light duty work assignment, she has failed to prove the two other elements of a prima facie case under the Pregnancy Discrimination Act ("PDA")—that she was qualified to receive the benefit of light duty and that the same benefit was available to others with similar qualifications. It continues that the Eighth Circuit has rejected plaintiff's view that she is entitled to preferential treatment because of her pregnancy. Defendant contends that its policy of only providing light duty work for only occupational injuries is a legitimate and non-discriminatory practice. It relies on affidavits by Dennis Cooper and Dean Inman—the majority of the contents which are contained in the facts deemed admitted.

In her response, plaintiff has submitted her affidavit which is set out below:

My name is Dawn Horton. I am the Plaintiff in the above captioned case.

I was put on light duty at Dr. Norman Smith's request by Lance Winford, the supervisor over the night shift. The light duty consisted of someone assigned to assist me with heavy lifting. R.D. Jordan, a supervisor, also agreed. After one and one half weeks, I was abruptly

terminated without any previous warning. The person assigned to help me, Melinda (last name unknown), kept my position.

Becky Johnson, an employee, was allowed to work on light duty through her pregnancy.

Aaron Varnell, an employee, was injured while playing ball outside of work and was given light duty.

She asserts that she was employed with defendant from April 20, 2000 until June 5, 2000 which was a period of forty-six days and then was employed from August 8, 2000 until September 27, 2000, which was a period of fifty days so that the total number of days of her employment with defendant is ninety-six days. Plaintiff argues that defendant violated its own stated policy as practiced since it provided light duty work to a male employee injured while playing ball, provided light duty work to plaintiff one and one half weeks prior to her termination, and had provided light duty to another pregnant employee, Becky Johnson. She also states that this Court should follow the Sixth Circuit's interpretation of the PDA that employers must treat pregnant employees in the same manner as they would other employees who were similarly situated with respect to their ability or inability to work rather than the Eleventh Circuit's holding that pregnant employees should be treated as an employee who receives a non-work-related injury.

Defendant replies that plaintiff is arguing that defendant has violated its light duty policy by allegedly providing light duty work assignment to employees that had non-occupational injuries and that Eighth Circuit precedent should be disregarded. It continues that it appears that plaintiff is attempting to discredit its articulated reason for her termination as merely a pretext for discrimination based on her own subjective and unsupported belief that defendant violated its light duty policy by her affidavit that Aaron Arnell[1] was provided with a light duty work assignment for a non-occupational injury and that another pregnant employee was provided with more favorable treatment. Defendant insists that plaintiff's affidavit fails to create a genuine issue dispute of material fact since it is factually inaccurate, legally flawed and is inadmissible evidence that cannot be considered for the summary judgment motion.

It asserts that her mistaken belief that Arnell was provided with a light duty work assignment after he injured his arm while playing ball is in contrast to Arnell's unequivocal affidavit that he returned to work after injuring his arm without any work restrictions, he never requested a light duty assignment, he was never provided with a light duty assignment, and he has no knowledge of defendant ever providing an employee with a light duty work assignment for a non-occupational injury. Turning to the second employee identified by plaintiff, defendant contends that there can be no inference of discrimination where the employee that plaintiff claims was treated more favorably was in the same protected class as plaintiff.

It continues that plaintiff's affidavit is not admissible evidence since she has failed to provide a proper foundation as setting forth her personal knowledge of her assertions regarding Arnell and Johnson and her allegations are pure hearsay. Defendant argues that since the Court should disregard plaintiff's unsupported al-

---

1. Defendant through the affidavit of Inman as the custodian of personnel records states that it has never had an employee named Varnell, but as Arnell did injure himself outside work, this must be the person plaintiff is referencing.

legations that she was treated less favorably than similarly situated employees who were not in the protected class, there is not a genuine dispute of material fact as to defendant's consistent and uniform enforcement of its light duty policy especially as virtually every witness identified by plaintiff in her Civil Procedure Rule 26 disclosures has stated that they have no knowledge of defendant ever providing a light duty work assignment to an employee that sustained a non-occupational injury.

In addressing plaintiff's contention that she was first provided with a light duty assignment and then abruptly terminated, defendant states that each witness identified by plaintiff that was allegedly involved in that assignment have all stated that plaintiff was never provided with a light duty assignment and that plaintiff's own version of events is internally inconsistent when she alleges that she was provided with light duty for one and a half weeks, but does not dispute that she did not provide defendant with the doctor's note that requested light duty for her until September 27, 2000, which was the day before her discharge. Defendant insists that reasonable jurors could not conclude by a preponderance of the evidence that she was provided with a light duty assignment and plaintiff has not presented any evidence that reflects a discriminatory attitude to permit a jury to infer that a discriminatory attitude was more likely than not a motivating factor in the employment decision. Finally, defendant states that the Eighth Circuit has firmly held that pregnant employees are not entitled to preferential treatment.

Besides the argument contained in defendant's reply, it submits additional exhibits. The December 4th affidavit of Aaron Arnell states that he was hired as a welder in March of 1999; that defendant has a policy that prohibits a leave of absence within an employee's initial ninety days of employment; that defendant has a policy and practice of only providing light duty work assignment to employees that have sustained an occupational injury and has never provided an employee with a light duty work assignment for a non-occupational injury; that he broke his right wrist while playing basketball on Monday, August 21, 2000, and had his wrist x-rayed at the emergency room that evening; that he was referred to a specialist on August 22, 2000, who performed surgery later that day and faxed a note to defendant at the affiant's request placing him off work; that on Friday, August 25, 2000, the affiant drove to get his paycheck and spoke to his direct supervisor Haley about when he would be returning to work; that Haley and he never discussed a light duty work assignment; that he returned to work on September 5, 2000 without any work restrictions; that Haley wanted him to train on the brake test since there was only one other employee qualified to perform the brake test, that employee had requested some vacation time, and that affiant could cover for the other employee while he was out on vacation; that the brake test is performed at the Hydro station, that he would perform some of the job duties at the Hydro station while being trained on the brake test, and that the job duties of the Hydro station are for the most part more physically demanding than the job duties at the 180 rotator position; that he never requested a light duty assignment nor was ever given a light duty work assignment; and that he had never heard of plaintiff before or has any knowledge of the facts or circumstances of her employment or termination.

Lance Winford's affidavit states that he was employed by defendant from May of 1996 to April of 2001 with his last position as a weld tech; that defendant has a policy and practice of only providing light duty

work assignment to employees that have sustained an occupational injury and has never provided an employee with a light duty work assignment for a non-occupational injury; that he has direct knowledge of the facts and circumstances of plaintiff's employment and termination with defendant; that plaintiff was a welder at defendant's Paragould facility where she was required to perform a variety of manual tasks which for the most part were restricted to ladders and brakes; that specifically she was required to operate high powered Huck Bolt Guns (weighing between 5 to 12 pounds) to fasten Huck bolts (approx. 4 to 5 inches) to large steel ladders; that she then was required to climb a ladder and blowtorch holes in the sidewall of a hopper rail car for the attachment of the steel ladder; that she would then lift the ladder with a crane, align the bolts attached to the ladder with the blowholes, and then fit and bolt the ladder to the sidewall; that while plaintiff's physical appearance made it evident in September of 2000 that she was pregnant, she satisfactorily performed her job duties without incident until September 27, 2000; that on that date, plaintiff told the affiant that her pregnancy was making it difficult for her to climb ladders and showed him a note from her physician which she retained; that the note restricted plaintiff to light duty work; that affiant contacted Tom Hazelwood shortly thereafter to inform him of the situation; that at the beginning of plaintiff's shift the next evening, a meeting was held to discuss plaintiff's light duty request; plaintiff was advised that modified work assignments—light duty work— are only available to employees that have sustained an occupational injury or illness and that she was further advised that defendant has consistently denied light duty work assignments to employees that have sustained a non-occupational injury or illness; that plaintiff was also reminded of

defendant's policies and practices that prohibit a leave of absence within an employee's initial ninety days of employment; that plaintiff refused to resign and stated that defendant would have to fire her; that her employment was terminated because she was unable to perform her job duties, was not eligible for a leave, and was not eligible for a light duty assignment; and that plaintiff's pregnancy was in no way a motivating factor in the decision to terminate her employment since it was by her own admission because she was unable to perform her job duties.

The affidavit of R.D. Jordan states that he has been employed by defendant since February 12, 1999, he was a Leadman over 180 rotator and 90 rotator on the second shift; that defendant has a policy that prohibits a leave of absence within an employee's initial ninety days of employment; that defendant has a policy and practice of only providing light duty work assignment to employees that have sustained an occupational injury and has never provided an employee with a light duty work assignment for a non-occupational injury; that he has limited knowledge of the facts and circumstances of plaintiff's employment and termination with defendant; that plaintiff was a welder at defendant's Paragould facility where she was required to perform a variety of manual tasks which for the most part were restricted to ladders and brakes; that specifically she was required to operate high powered Huck Bolt Guns (weighing between 5 to 12 pounds) to fasten Huck bolts (approx. 4 to 5 inches) to large steel ladders; that she then was required to climb a ladder and blowtorch holes in the sidewall of a hopper rail car for the attachment of the steel ladder; that she would then lift the ladder with a crane, align the bolts attached to the ladder with the blowholes, and then fit and bolt the ladder to the sidewall; that as

with all second shift employees, plaintiff was required to assist in the rotator clean up and all other positions since the second shift ran on a team concept and so all employees were required to assist whenever needed; that while plaintiff's physical appearance made it evident in September of 2000 that she was pregnant, she satisfactorily performed her job duties without incident; that in August of 2000, the affiant gave plaintiff some baby supplies; that on September 28, 2000, affiant sat in on a supervisor-training meeting where a hypothetical fact pattern was discussed that related to a pregnant employee who could not perform her job duties; that the supervisors discussed that the only approach for an employee with less than 90 days of service would be to ask the employee to resign because light duty was not available to employees with non-occupational injuries; that later during the meeting when plaintiff's name was associated with the hypothetical fact pattern, the affiant volunteered to discuss the situation with plaintiff.

The affiant continues that shortly before the supervisor training meeting and possibly the evening before, he overheard a conversation between plaintiff and Winford in which plaintiff told Winford that if someone else could get inside the ladders for her and weld the inside that it would make it a lot easier for her and that right before the supervisor training meeting there was a conversation in the supervisors' office about plaintiff providing a doctor's note for a light duty assignment; that plaintiff was never provided a modified work assignment or a light duty assignment; that until she was discharged, plaintiff performed all of the required job duties of her position; that plaintiff's job performance did slow down because of her pregnancy; that other employees would assist plaintiff in completing her job tasks as with any other employee that falls behind; that the second shift had a team orientated concept and all employees were expected to help other employees; that at times, plaintiff did show Belinda Tutor how to perform some of the welding tasks on ladders which resulted in Tutor performing some of plaintiff's job duties in plaintiff's presence, but that assistance was not a light duty assignment or job modification; that at the beginning of the second shift after the supervisor training meeting, the affiant went to discuss the situation with plaintiff; that before he could discuss the situation with plaintiff. Winford and the affiant observed plaintiff crying outside the supervisor's office since she was upset because Sonny Haley had asked her to resign; that Winford instructed plaintiff to go talk to Dennis Cooper; that Winford told the affiant later that evening that plaintiff's employment was terminated for not being able to perform her job duties; that the following week, he heard plaintiff state that she had spoken to a lawyer and was going to sue defendant; and that affiant does not believe that plaintiff was discriminated against because she was pregnant since defendant treated plaintiff fairly and in the same manner as all other non-pregnant employees, she was terminated because she was unable to perform her job duties, and she would not have been terminated if she were able to perform all of her job duties.

The affidavit of Belinda Tutor states that while she has been employed as a welder by defendant since August 30, 2000, she is currently laid off; that she has knowledge of the facts and circumstances of plaintiff's employment with defendant and the termination of her employment; that plaintiff was a welder at defendant's Paragould facility; that plaintiff was a welder at defendant's Paragould facility where she was required to perform a variety of manual tasks which for the most

part were restricted to ladders and brakes; that specifically she was required to operate high powered Huck Bolt Guns (weighing between 5 to 12 pounds) to fasten Huck bolts (approx. 4 to 5 inches) to large steel ladders; that she then was required to climb a ladder and blowtorch holes in the sidewall of a hopper rail car for the attachment of the steel ladder; that she would then lift the ladder with a crane, align the bolts attached to the ladder with the blowholes, and then fit and bolt the ladder to the sidewall; that as with all second shift employees, plaintiff was required to assist in the rotator clean up and all other positions since the second shift ran on a team concept and so all employees were required to assist whenever needed; that plaintiff's physical appearance made it evident in September of 2000 that she was pregnant and she also told the affiant that she was pregnant; that affidavit believes that plaintiff had her baby in the beginning of 2001; that affiant was also a welder assigned to brakes and ladders and was told when she started that she would be taking over for plaintiff while she was on maternity leave so plaintiff was asked to train her; that she does not recall plaintiff complaining about her pregnancy, but she complained about Huck guns jamming and complained a couple times about climbing into the cars, however, the affiant never witnessed plaintiff complaining to a supervisor about climbing into cars; that while plaintiff was training her, the affiant began to perform some of her job duties, but the division of job duties was determined by plaintiff and herself and they were never told by a supervisor or leadman how to divide the job duties; that affiant was never told by anyone in management that plaintiff's job duties were restricted in any manner and that plaintiff was never provided with a light duty work assignment performing all her job duties up to the last day of her employment; that shortly before her last day of employment, plaintiff left work to go to her doctor; that the next day, plaintiff told her she got a note from her doctor that restricted her to light duty, she asked her opinion of what she should do, affiant told her that it was her decision and she needed to talk to Winford or Tom Hazelwood, plaintiff said she was afraid that she would lose her job, and the affiant did not witness plaintiff talking to anyone in management that evening; that the next evening before the shift began, the affiant witnessed plaintiff speaking to Hazelwood in a very threatening and utterly inappropriate manner by screaming profanities at him, Hazelwood just turned around and walked away, she believes plaintiff should have been fired for speaking to her supervisor in such a threatening and inappropriate manner, and she had seen employees fired for a lot less than for what plaintiff had done; that plaintiff then returned to their worksite and worked for about 10–15 minutes and then went back to the supervisors' office, when she returned about one hour later, she gathered her tools and told affiant and Sammy Williams that she was fired due to her pregnancy and then left the building; that affiant next saw plaintiff at the Paragould Methodist Hospital after plaintiff had her baby that morning, plaintiff asked if affiant was still working at defendant and then went back to her room, and affiant has not spoken with plaintiff since that encounter; that defendant has never provided an employee with a light duty work assignment for a non-occupational injury; and that affiant does not believe that plaintiff was discriminated against because she was pregnant since defendant treated plaintiff fairly and in the same manner as all other non-pregnant employees and she was terminated because she was unable to perform her job duties.

Scott Small's affidavit states that he has been employed by defendant since December 15, 1995 and his current job title is Production Superintendent at the Marmaduke facility, but he was a sub-assembly supervisor at the Marmaduke facility in September of 2000; that defendant has a policy that prohibits a leave of absence within an employee's initial ninety days of employment which has consistently and uniformly been enforced; that defendant has a policy and practice of only providing light duty work assignments to employees that have sustained an occupational or workers' compensation injury; that defendant has never provided an employee with a light duty work assignment for a non-occupational injury and that while the affiant cannot recall specific names, employees have been denied light duty work assignments for non-occupational injuries; that he supervised Rebecca Johnson who was a head block welder at the Marmaduke facility where she was required to lift and weld a head block (approx. 10 to 15 pounds) between the end seal of the tank car and the tank head, all of which is part of the underframe assembly; that Johnson welded a multiple pass joint which required her to perform various wels including overhead, flat, and uphill welds and she was also routinely required to climb ladders to access certain areas when the tank cars were placed on their sides; that Johnson informed the affiant that she was pregnant and did not know how long she would be able to continue to perform her job duties; that affiant told her to continue working and that they would cross that bridge when they came to it; that Johnson never requested a light duty work assignment nor requested a job modification or restructuring and that she always performed all of her job duties without modifications or restructuring; that the Marmaduke facility began to lay-off a limited number of employees in June of 2001 and,

pursuant to its practice of asking for voluntary layoffs before conducting involuntary layoffs, sought voluntary layoffs; that Johnson volunteered to be laid off and was laid off on June 27, 2001; that Johnson's pregnancy was not a motivating factor in her lay-off as she volunteered to be laid off; and that the affiant had no knowledge of plaintiff, her employment with defendant or the facts and circumstances of the termination of her employment.

Plaintiff's November 20th preliminary Rule 26 disclosures lists the individuals who may have discoverable information to support her claim as herself, Inman. Cooper, Winford, Haley, Hazelwood, Jordan, Melinda [sic], Johnson, and Varnell [sic]. The plaintiff's September 29, 2000 termination form reflects that her last day of work was September 28, 2000, that the reason for her termination was that she was placed on restricted, light duty by her doctor due to a long-term medical condition that was not work related and since the company does not have modified duty unless the condition is work related, she was discharged. The form that was approved by Cooper states that plaintiff was eligible for rehire and her hire date as August 8, 2000.

The August 7, 2000 agreement signed by plaintiff and Cooper as to re-employment conditions reflects that she would be re-employed effective August 8, 2000, she was entitled to the benefits afforded newly-hired employees, her length of service begins anew as of August 8, 2000, and her absenteeism record would begin with no occurrences.

■ First, the Court must address the impact of the portion of plaintiff's affidavit which contradicts her admission, pursuant to Local Rule 56.1, of undisputed facts. Plaintiff admitted that:

On September 27, 2000, Horton complained to her direct supervisor Lance Winford that her pregnancy was making it difficult for her to perform all of her required job duties. The next day, Horton told her former supervisor Sonny Haley that she was having difficulty performing her job duties. Later that day, Horton provided Plant Superintendent Tom Hazelwood with a doctor's note that recommended light duty.

Horton's physician, Dr. Norman Smith, restricted Ms. Horton's duties as follows: "Pl is pregnant and due to change in balance and other changes in pregnancy *I recommend light duty*—avoid lifting over 10 lbs–15lbs/climbing ladders, straining, etc."

However, in her affidavit, she stated:

I was put on light duty at Dr. Norman Smith's request by Lance Winford, the supervisor over the night shift. The light duty consisted of someone assigned to assist me with heavy lifting. R.D. Jordan, a supervisor, also agreed. After one and one half weeks, I was abruptly terminated without any previous warning. The person assigned to help me, Melinda (last name unknown), kept my position.

In *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir. 1995), the appellate court discussed how contradictory affidavits should be treated as follows:

Typically, a dispute of fact on a material issue would preclude summary judgment. However, this circuit has long held that parties to a motion for summary judgment cannot create sham issues of fact in an effort to defeat summary judgment. See *Camfield Tires,*

*Inc. v. Michelin Tire Corp.*, 719 F.2d 1361 (8th Cir.1983).

In *Camfield*, we held that contradictory affidavits will preclude summary judgment only if the prior testimony reflects confusion on the part of the witness and the affidavits explain why the earlier testimony is in conflict with the affidavits. *Id.*

Here, plaintiff has admitted that defendant was advised of her doctor's request for light duty on September 28th and the complaint alleges that she was terminated on September 28th.[2] Therefore, plaintiff, who has failed to explain this discrepancy after it being pointed out by defendant, will not be permitted to create a fact issue that she was given light duty for one and half weeks between her doctor's request and her termination.

In *Lang v. Star Herald*, 107 F.3d 1308, 1311–1312 (8th Cir.1997), *cert. denied*, 522 U.S. 839, 118 S.Ct. 114, 139 L.Ed.2d 66 (1997), the Eighth Circuit summarized the analysis for a PDA claim as follows:

Title VII makes it "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a) (1994). In 1978, Congress enacted the Pregnancy Discrimination Act (PDA), amending the definitional provision of Title VII to clarify that discrimination "on the basis of pregnancy, childbirth, or related medical conditions" is sex discrimination under Title VII. *Id.* § 2000e(k).

\*    \*    \*    \*    \*    \*

---

**2.** The other affidavits and the personnel record also reflect the September 28th termination date.

We begin with Lang's disparate treatment claim. She does not offer any direct evidence of discriminatory intent to support her claim, so we analyze the facts under the familiar burden-shifting framework set out by the McDonnell Douglas line of cases. See *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–08, 113 S.Ct. 2742, 2746–48, 125 L.Ed.2d 407 (1993); *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 713–15, 103 S.Ct. 1478, 1480–82, 75 L.Ed.2d 403 (1983); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1819, 36 L.Ed.2d 668 (1973). Under this framework, Lang must first have evidence that will establish a prima facie case, namely, (1) that she belonged to a protected class, (2) that she was qualified to receive the benefit of an indefinite unpaid leave of absence with a guarantee of returning to her former position, (3) that she was denied the benefit, (4) and that the same benefit was available to others with similar qualifications. See *Adams v. Nolan*, 962 F.2d 791, 794 (8th Cir.1992). If she successfully establishes a prima facie case, the burden of production shifts to the *Star Herald* to offer a nondiscriminatory reason for its action. *Stevens v. St. Louis Univ. Medical Ctr.*, 97 F.3d 268, 270–71 (8th Cir.1996). Once the *Star Herald* advances a nondiscriminatory reason, Lang must show, in this summary judgment proceeding, that she has sufficient admissible evidence from which a rational factfinder could find that the *Star Herald's* proffered nondiscriminatory reason was either untrue or not the real reason, and that intentional discrimination was the real reason. *Hicks*, 509 U.S. at 515, 113 S.Ct. at 2751–52; *Ryther v. KARE 11*, 108 F.3d

832, 838 n. 5 (8th Cir.1997) (en banc); see also *Ryther*, at 848 n. 13 (Part I.A. of concurring and dissenting opinion, in which eight active judges joined).

\*   \*   \*   \*   \*   \*

Title VII requires employers to treat employees who are members of protected classes the same as other similarly situated employees, but it does not create substantive rights to preferential treatment. 42 U.S.C. § 2000e–2(j) (1994). Thus, as the prima facie elements enumerated above demonstrate, Lang must have evidence that she was treated differently than similarly situated employees. In fact, the PDA specifically states that "women affected by pregnancy, childbirth, or related medical conditions *shall be treated the same* for all employment-related purposes, including receipt of benefits under fringe benefit programs, *as other persons not so affected but similar in their ability or inability to work.*" 42 U.S.C. § 2000e(k) (1994) (emphasis added). See also *Carney v. Martin Luther Home, Inc.*, 824 F.2d 643, 646 (8th Cir. 1987) ("Congress sought to limit the burden on employers by making clear that the amendment was intended only to prevent the *exclusion* of pregnancy coverage, not to require that employers who had no disability or medical benefits at all provide them to pregnant women."). As the Seventh Circuit candidly stated, "The [PDA] does not require that employers make accommodations for their pregnant workers; 'employers can treat pregnant women as badly as they treat similarly affected but non-pregnant employees.'" *Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996) (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 738 (7th Cir. 1994)). The plaintiff's burden of establishing a prima facie case serves, in part,

to assure that the plaintiff has some competent proof that she was treated differently than similarly situated employees.[3]

Defendant has presented detailed affidavits from Arnell about his injury, his lack of requesting or being given light duty, and his training at the Hydro facility to be able to cover for another vacationing employee with some more physically demanding duties than his normal job as a rotator and Johnson's supervisor at the Marmaduke facility about Johnson never asking for or being given light duty and her volunteering for lay-off. In contrast, plaintiff has merely presented conclusions in her affidavit without stating that it is based on her personal knowledge or what is the basis of her knowledge considering that she worked at the Paragould facility while Arnell was working at the Hydro facility and Johnson worked at the Marmaduke facility. Even after defendant's fully documented reply and argument, plaintiff has chosen to rest on her conclusory statements. Under these circumstances, the Court must find that plaintiff has not offered sufficient *admissible* evidence from which a rational factfinder could find that she was treated differently than similarly situated employees. The Eighth Circuit in *Palesch v. Missouri Com'n on Human Rights*, 233 F.3d 560, 568 (8th Cir.2000) affirmed the district court's finding "that Palesch failed to produce 'specific, tangible evidence' to demonstrate a disparity in treatment between similarly situated employees. See *Rose–Maston v. NME Hospitals, Inc.*, 133 F.3d 1104, 1109 n. 4 (8th Cir.1998)."

Accordingly, the portion of defendant's November 8th motion (# 2–2) for summary judgment is granted thereby rendering the portion of the motion (# 2–1) to dismiss moot. A separate judgment will be entered.

**3.** The Court notes that the appellate court clarified in *Deneen v. Northwest Airlines, Inc.*, 132 F.3d 431, 437–438 (8th Cir.1998) that the comparison group under the specific facts there was not other pregnant employees, but pregnancy-related complications—a situation that is not at issue here:

> On the first argument, we acknowledge our statement of the relevant question in a pregnancy discrimination case is whether the employer treated the pregnant plaintiff "differently than nonpregnant employees ... not whether the [employer] could have made more concessions for [the plaintiff]." *Lang*, 107 F.3d at 1313. This statement of the issue emphasizes that the state of being pregnant is not itself a reason for distinguishing between employees. Employers must look to the employee's actual abilities. A comparison with other pregnant employees in most instances will not give rise to an inference of discrimination on the basis of pregnancy. In this particular case, however, where NWA suspected some pregnancy-related complication on the part of the plaintiff close to. the time when she was being recalled (and if she were not recalled. NWA would not have to give her earned sick leave benefits), a showing that the employer gave better treatment to similarly restricted pregnant persons who were already on the clock does support a finding of intentional discrimination. While the comparison group was similarly pregnant, our analysis is unaffected in this particular case because the distinguishing feature is not the pregnancy alone but Mrs. Deneen's pregnancy-related complication which NWA assumed existed before even talking with Mrs. Deneen and which could require her to exercise her earned benefits.