# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 00-2710

_____

P.H.,

        Appellant,

    v.

The School District of Kansas City,
Missouri,

        Appellee.

\* \* \* \* \* \* \* \* \* \*

Appeal from the United States
District Court for the
Western District of Missouri.

_____

Submitted: May 16, 2001
Filed: September 7, 2001

_____

Before WOLLMAN, Chief Judge, HANSEN, Circuit Judge, and BARNES,[1] District
    Judge.

_____

HANSEN, Circuit Judge.

_____

[1]The Honorable Harry F. Barnes, United States District Judge for the Western
District of Arkansas, sitting by designation.

P.H. appeals the district court's[2] grant of summary judgment in favor of the Kansas City School District (KCSD) in this case, alleging civil rights violations and sexual discrimination arising from a two-year sexual relationship between a high school teacher and P.H., who was a student at the time. We affirm.

I.

In the summary judgment context, we view the facts and the inferences to be drawn from them in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The facts asserted, however, must be properly supported by the record. Tlamka v. Serrell, 244 F.3d 628, 632 (8th Cir. 2001). The undisputed facts taken in the light most favorable to P.H. are as follows.

John Hopkins, a teacher at Paseo High School in Kansas City, Missouri, engaged in sexual relations with a male student, referred to here as P.H., from late 1995 through December 1997. P.H. said that Hopkins engaged him in oral sex almost daily throughout that time period, oftentimes at school during school hours or at hotels and other places. Hopkins gave P.H. many gifts and offered help as P.H.'s grades began to drop from his failure to attend classes. P.H. was absent from classes approximately 25% of the time. His many absences and excessive tardiness resulted from spending too much time with Hopkins during the school day.

KCSD claimed that it had no notice of Hopkins' misbehavior until P.H.'s mother complained on January 5, 1998. Dorothy Shepherd had been the school principal from 1995 through December of 1997, and she was succeeded by Roger Williams in January

---

[2]The Honorable John T. Maughmer, Chief United States Magistrate Judge for the Western District of Missouri, presiding by consent of the parties pursuant to 28 U.S.C. § 636(c).

of 1998.  Sherry Sample was the vice principal the entire time.  The only complaints school officials received concerned P.H.'s tardiness and absences or general complaints about P.H. spending too much time with Hopkins.  Also, teachers noticed that P.H.'s grades began to fall.  Neither P.H. nor anyone else ever complained to school officials about sexual abuse or suspected abuse while it was occurring.  Principal Dorothy Shepherd testified that several of P.H.'s teachers had complained to her about Hopkins making P.H. tardy or absent from their classes and that P.H.'s grades were suffering because of it.  Ms. Shepherd had confronted Hopkins and warned him to discontinue his actions.  She had also spoken to P.H. and his mother about the concerns.

Vice Principal Sherry Sample had heard complaints that Hopkins was spending "a lot of time with the same students."  (Appellant's App. at 378.)  Fearing that his actions appeared to be favoritism, Ms. Sample confronted Hopkins about the complaints, but Hopkins always had an explanation because the same students were involved in student organizations and activities that he sponsored, such as his leadership class,  student council, and his peer mediation team.  He explained that he would naturally have more contact with these students, and P.H. was one of them.  Ms. Sample stated as follows:  "But what I told him was, I said, you know, you're spending a lot of time with the same kids.  I'm not accusing you of anything, but it just doesn't look right so I wouldn't recommend it.  He always had a logical explanation."  (Id. at 380-81.)  Ms. Sample testified that prior to the complaint by P.H.'s mother, she had never heard rumors or reports that Hopkins was having improper sexual or physical contact with students.  After the investigation came to light, she said she had heard one teacher remark that "they finally got him . . . or something along those lines."  (Id. at 390.)  There is no evidence, however, that any teacher had expressed a suspicion of sexual abuse prior to that time.

Immediately following the complaint by P.H.'s mother in January of 1998, the principal removed Hopkins from the classroom, reported the allegations to the Division of Family Services, initiated an investigation, and petitioned for the revocation of

Hopkins' teaching license. Hopkins never returned to the classroom but was allowed to remain as an employee of the KCSD in an administrative capacity, pending completion of the investigation. Ultimately, in July 1999 Hopkins pleaded guilty to four counts of statutory sodomy involving P.H. and voluntarily resigned.

P.H. brought this lawsuit against the KCSD, asserting sexual discrimination in violation of Title IX, see 20 U.S.C. § 1681 (1994); civil rights violations under 42 U.S.C. § 1983; common law failure to supervise; and a violation of the Violence Against Women Act. The district court granted the KCSD summary judgment on all grounds. P.H. appeals the grant of summary judgment only as to the § 1983 claim for civil rights violations and the Title IX sexual discrimination claim.

II.

We review the district court's grant of summary judgment de novo, applying the same standards as the district court. Stuart v. Gen. Motors Corp., 217 F.3d 621, 630 (8th Cir. 2000). Summary judgment is appropriate if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "To avoid summary judgment, the non-movant must make a sufficient showing on every essential element of its claim on which it bears the burden of proof." Buettner v. Arch Coal Sales Co., 216 F.3d 707, 718 (8th Cir. 2000), cert. denied, 121 S. Ct. 773 (2001). We look to the substantive law to determine whether an element is essential to a case, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). P.H., as the nonmoving party, "is entitled to all reasonable inferences–those that can be drawn from the evidence without resort to speculation." Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1110 (8th Cir. 2001) (internal quotations omitted).

4

A.

P.H. first argues that the district court erroneously granted summary judgment on the § 1983 claim. "It is well-settled that the Due Process Clause of the Fourteenth Amendment protects the liberty interest of a child in public school from sexual abuse." Shrum ex rel. Kelly v. Kluck, 249 F.3d 773, 778 (8th Cir. 2001). A school district can be liable for civil rights violations under § 1983 either for failing to receive, investigate, and act upon complaints of sexual abuse or for failing to train its employees to prevent or terminate sexual abuse. Thelma D. v. Bd. of Educ. of City of St. Louis, 934 F.2d 929, 932, 934 (8th Cir. 1991). P.H. contends that material issues of fact remain concerning whether the KCSD had notice of the sexual abuse and whether it failed to train its employees to avoid sexual abuse with students or to recognize and report sexual abuse.

1. Failure to Receive, Investigate, and Act on Complaints.

A school district "may be found liable for 'a governmental custom of failing to receive, investigate and act upon complaints of sexual misconduct of its employees' if the [plaintiff] proved the existence of an official custom of such conduct and if that custom caused [the plaintiff] constitutional harm." Larson v. Miller, 76 F.3d 1446, 1453 (8th Cir. 1996) (en banc) (quoting Thelma D., 934 F.2d at 932). To establish the custom of failure to receive, investigate, or act on complaints of constitutional violations, the plaintiff must prove (1) a continuing, widespread, persistent pattern of misconduct by the government employee; (2) deliberate indifference to or tacit authorization of the conduct by the policy-making officials after the officials have notice of the conduct; and (3) a resulting injury on the part of the plaintiff. Jane Doe A. v. Special Sch. Dist., 901 F.2d 642, 646 (8th Cir. 1990).

There is no dispute that the sexual abuse violations by Hopkins were persistently ongoing from 1995 through 1997 and that they caused injury to the plaintiff. However,

5

P.H. has failed to demonstrate a material issue of fact showing that the KCSD had notice of the conduct and was deliberately indifferent to or tacitly authorized the inappropriate conduct. Instead, the record demonstrates that once P.H.'s mother complained, the school district took immediate action to remove Hopkins from the classroom and begin a criminal investigation. Prior to that complaint, there were no reports of sexual contact or suspected sexual contact between P.H. and Hopkins. The school officials had inquired about Hopkins' conduct of spending too much time with P.H. and causing him to be absent from or tardy to classes. School officials had warned Hopkins to discontinue this conduct. There is no indication, however, that the KCSD had any notice of an ongoing pattern of sexual abuse by Hopkins; the KCSD may not be found to have been deliberately indifferent to or to have tacitly authorized conduct of which it was unaware.

P.H. would have us infer notice to the KCSD from the totality of the facts. He points first to the fact that he spent too much time with Hopkins resulting in excessive tardiness and absences. We conclude that this is an insufficient basis from which reasonably to infer that the KCSD had notice of the sexual misconduct. The record indicates that Hopkins was spending an excessive amount of time with P.H., resulting in absences, tardiness, and falling grades. Such action on the part of a teacher is certainly cause for concern, but it does not automatically give rise to a reasonable inference of sexual abuse. The principal and vice principal confronted Hopkins and expressed concern to P.H. and his mother, but allegations of sexual misconduct never surfaced. The school officials' conduct of not discovering the sexual abuse given all of P.H.'s absences and his falling grades at most rises to negligence, but mere "negligence does not implicate [F]ourteenth [A]mendment protections." Id.

P.H. also asserts that Vice Principal Sherry Sample had heard rumors of an improper sexual relationship between them, that there was a 1978 allegation of sexual misconduct between Hopkins and a male student in a different school, and that there was one incident at school where a teacher walked into an office and discovered

Hopkins and P.H. in the act of sexual contact. After thoroughly reviewing the record, we conclude that P.H.'s assertions are not factually accurate. As the nonmoving party, P.H. is entitled to all inferences that reasonably can be drawn from the record evidence. The record here simply does not support P.H.'s characterization of these facts.

First, Ms. Sample stated only that she had heard "rumors." (Appellant's App. at 378.) Specifically, she explained that the rumors she had heard were that Hopkins "[s]pends a lot of time with the same students." (Id.) She did not state that these rumors insinuated any sexual misconduct. In fact, she explicitly answered "no" to the question of whether she had heard any rumors, gossip, or reports "that Mr. Hopkins was having improper sexual or physical contact with students." (Id. at 389.) Ms. Sample once confronted Hopkins about his conduct of spending too much time with P.H. saying, "I'm not accusing you of anything, but it just doesn't look right so I wouldn't recommend it." (Id. at 380-81.) P.H. asserts that Ms. Sample was actually accusing Hopkins of sexual misconduct. Such an inference, however, does not arise from the record. Ms. Sample's own testimony clarified her statement. She said, "[t]o me it gave the idea of favoritism to other students. Or he might be trying to pull s[t]rings for them." (Id. at 382.)

Second, the record indicates nothing more than a report or allegation of sexual abuse involving Hopkins nearly 20 years before, in 1978. KCSD asserts that the allegation was not substantiated. Both Hopkins and the alleged student victim denied the incident. Hopkins was transferred to Paseo High School on serious charges of misconduct. Hopkins asserts the transfer resulted from his refusal to take a polygraph examination about the incident on the advice of counsel. Even taking the 1978 report as a credible complaint, it remains as one isolated complaint that was nearly 20 years old at the time of Hopkins' abusive conduct in this case. While it is undisputed that the pattern of behavior against P.H. was continuing and persistent, there is no evidence that the KCSD had knowledge of that pattern of behavior, and this one 20-year-old complaint is not itself a sufficient basis on which to infer that the KCSD had notice of

the improper sexual contact between Hopkins and P.H.  See Larson, 76 F.3d at 1453 (noting that we have held records with far more complaints than one as insufficient to constitute a pattern of unconstitutional behavior).

Finally, P.H.'s assertion that a teacher walked in and observed him in an act of sexual contact with Hopkins is not substantiated even by P.H.'s own testimony.  P.H. could not identify the teacher, and he testified only that on one occasion, a woman teacher walked into an office where he and Hopkins were engaged in sexual contact.  As she turned on the light, Hopkins put on his glasses and pretended to look in a file cabinet and P.H. covered himself up "and leaned up so she doesn't see anything else." (Appellant's App. at 319-20.)  Thus, by P.H.'s own testimony, this unidentified teacher did not see a sexual act.

P.H. hid the relationship and did not complain about sexual misconduct until the relationship had ended.  The record contains no evidence from which we can properly infer that the KCSD had notice of any sexual contact between the two, let alone a pattern of sexual misconduct by Hopkins against P.H.  Thus, the district court correctly determined that there can be no § 1983 liability here for failure to adequately receive, investigate, or act upon complaints of sexual abuse by an employee.

### 2.  Failure to Train.

To establish § 1983 liability on the part of a school district for failure to adequately train its employees to report and prevent sexual abuse of students, there must be proof that this failure to train evidences a deliberate indifference to the rights of the students.  Larson, 76 F.3d at 1454.  The plaintiff must prove that the school district had notice that its procedures were inadequate and likely to cause a constitutional violation.  Id.  Notice may be implied where the failure to train is so likely to result in a constitutional violation that the need for training is patently obvious or where a pattern of misconduct indicates that the school district's responses to a

regularly recurring situation are insufficient to protect the students' constitutional rights. Thelma D., 934 F.2d at 934, 935.

The record indicates that the KCSD had developed and implemented policies prohibiting sexual abuse of students and procedures for handling complaints of sexual abuse. The KCSD required employees to report all suspected cases of child abuse. The teacher handbooks state policies prohibiting sexual abuse and harassment, procedures were in place for remedying such abuse, and in-service meetings were held to educate administrators and staff. P.H. complains that the 1995 sexual harassment in-service training involved only supervisors and administrators, not teachers. The summary report of this in-service training, however, provides a list of the next steps for the KCSD, which specifically includes "[w]ork[ing] with school building administrators to ensure understanding among teachers and staff." (Appellant's App. at 166.) There is no indication on this record that the KCSD had notice that its policies were inadequate. Training appears to have been ongoing. There is no evidence of any other complaints of teacher-student sexual misconduct and no indications that the failure to offer more training was likely to result in a constitutional violation.

P.H. complains that the policies in place prohibited only unwelcome sexual contact, not consensual sexual contact between a student and a teacher. We respectfully disagree. Even the policy approved as early as December 1994 defines improper sexual harassment as consisting "of verbal or physical conduct relating to an individual's sex which has any one of the following effects . . . interfering with an individual's work or academic performance." (Appellant's App. at 163.) Regardless of the welcome or unwelcome nature of the sexual contact between P.H. and Hopkins, that contact certainly had the effect of interfering with P.H.'s academic performance, and Hopkins had notice that this was prohibited conduct by reason of the handbook. He also had been given personal warnings that he should not interfere with P.H.'s ability to attend regular classes. A handbook need not spell out every specific factual

9

scenario of sexual abuse or harassment that is prohibited in order to be effective. Hopkins simply chose to disregard the handbook and all common sense.

## B.  Title IX

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  It is important to note, however, "that the recipient of federal funds may only be liable for damages arising from its own misconduct." Shrum, 249 F.3d at 781.  Thus, in cases involving discrimination by an employee of the recipient of federal funds, and not by any official policy of the recipient entity, there can be no Title IX liability "unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond."  Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998); see also Shrum, 249 F.3d at 782 (holding school district must be "(1) deliberately indifferent (2) to known acts of discrimination (3) which occur under its control" to be liable under Title IX).  In other words, a school district must have had actual notice of a teacher's sexual harassment of a student and the school district must have made an official decision not to remedy the violation in order for liability to attach to the school district.  Kinman v. Omaha Pub. Sch. Dist., 171 F.3d 607, 610 (8th Cir. 1999).

P.H. argues that the actual notice standard of Gebser has not yet been clearly defined.  Relying on the 1978 allegation of abuse and his own statement that a teacher had walked in on a sexual act occurring on school grounds, P.H. asserts that the KCSD had received sufficient actual notice to suffer Title IX liability.  We respectfully disagree.

10

P.H. argues that the KCSD had notice of a prior report of sexual abuse against Hopkins in 1978 and failed to investigate, indicating actual knowledge and an official decision not to remedy the discrimination. The record, however, does not support this assertion. Hopkins testified by deposition that he was informed of an investigation in 1978, that he knew students who were questioned about the allegation, that he was asked to take a polygraph test but refused on the advice of counsel, and that the investigation was closed because the boy denied the incident and so did Hopkins. Also, a former school board member testified that, while he could not remember this particular incident, it was the school board's practice to destroy the records of investigations that were not substantiated. The record does not support P.H.'s assertion that the school district was deliberately indifferent to the 1978 report of abuse. In any event, we conclude that the lone allegation of abuse in 1978 is too remote to amount to actual notice that P.H. was being sexually abused in the late 1990s.

P.H. asserts that where the misconduct happened on school grounds, "teachers may well possess the requisite control necessary to take corrective action to end the discrimination." Murrell v. Sch. Dist. No. 1, Denver, Colo., 186 F.3d 1238, 1248 (10th Cir. 1999). Thus, he asserts that the knowledge of the teacher who walked in on a sexual act is sufficient actual notice to hold the school district liable because that teacher had a mandatory duty to report the abuse. Again, we take issue with P.H.'s characterization of the facts. As noted earlier, the record reveals that although P.H. said a teacher walked in, he also said that both he and Hopkins acted quickly to cover up the sexual nature of the incident. Thus, it is highly unlikely the other teacher realized what had occurred. We conclude that there is an insufficient factual basis in this record (even giving P.H. all of the reasonable inferences) to consider P.H.'s claim that a teacher who is not the wrongdoer but who has a duty to report might have sufficient control to take remedial action. In any event, we could not conclude that the innocent teacher's knowledge amounts to actual notice of the wrongdoing to the federal funds recipient. Title IX liability may not be predicated on respondeat superior liability. See Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 643 (1999) ("The

11

high standard imposed in <u>Gebser</u> sought to eliminate any 'risk that the recipient would be liable in damages not for its own official decision but instead for its employees' independent actions.'" (quoting <u>Gebser</u>, 524 U.S. at 290-91)); <u>Kinman</u>, 171 F.3d 609-10 (holding that "[i]t would frustrate the purposes of Title IX to permit a damages remedy against a school district for a teacher's sexual harassment of a student based upon principles of *respondeat superior* or constructive notice, *i.e.*, without actual notice to a school district official").

P.H. argues that the KCSD had sufficient actual knowledge of facts from which it could draw a reasonable inference that sexual abuse was occurring. Teachers complained that Hopkins was spending too much time with P.H., who was excessively absent and tardy, and that it was causing P.H.'s grades to suffer. There were concerns that Hopkins might be showing favoritism to some students, including P.H. None of these complaints, however, voiced any suspicions of sexual abuse. When confronted about the problem of P.H. and certain other students spending too much time with Hopkins, Hopkins recited legitimate reasons to account for the time owing to the many school activities he sponsored and supervised involving these students. The Supreme Court has refused to impose Title IX liability in situations where the school district failed to react to teacher-student harassment of which it <u>should</u> <u>have</u> known. <u>Davis</u>, 526 U.S. at 642. The Court has clearly rejected this type of a negligence standard, concluding instead that Title IX liability attaches only where the school district has actual knowledge and remains deliberately indifferent to acts of teacher-student harassment. <u>Id.</u> (citing <u>Gebser</u>, 524 U.S. at 290). P.H. has failed to meet this standard on the record before us. We agree with the district court's statement that "the record is devoid of evidence that policymakers with the KCSD had actual knowledge of Hopkins' sexual misconduct." (Appellant's Add. at 12.)

III.

Accordingly, we affirm the judgment of the district court.

12

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.