# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT
_____

No. 02-3228
_____

| | | |
|---|---|---|
| Jeanette Larkin, | * | |
| | * | |
| Plaintiff/Appellant, | * | |
| | * | |
| Jeanette Larkin, Estate of Mauritius | * | |
| Larkin, deceased, by personal | * | |
| representative, | * | |
| | * | |
| Plaintiff, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | Eastern District of Missouri. |
| | * | |
| St. Louis Housing Authority | * | |
| Development Corporation, a | * | |
| Municipal Corporation, | * | |
| | * | |
| Defendant/Appellee, | * | |
| | * | |
| Wayman Smith, III, in his individual | * | |
| capacity as a member of the Board of | * | |
| Police Commissioners; Edward Roth, | * | |
| in his individual capacity as a member | * | |
| of the Board of Police Commissioners; | * | |
| Mark W. Smith, in his individual | * | |
| capacity as a member of the Board of | * | |
| Police Commissioners; Leslie Bond, | * | |
| Sr., Dr., in his individual capacity as a | * | |
| member of the Board of Police | * | |
| Commissioners; Clarence Harmon, | * | |
| Mayor, in his individual capacity as a | * | |
| member of the Board of Police | * | |

Commissioners; John Johnson,　　　*

　　　　Defendants.　　　　　*

_____

Submitted:　September 11, 2003

Filed:　January 23, 2004

_____

Before WOLLMAN, BOWMAN, and RILEY, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Jeanette Larkin (Larkin) appeals from the district court's[1] entry of summary judgment in favor of the St. Louis Housing Authority Development Corporation (Authority). We affirm.

## I.

This case arises out of the shooting death of Mauritius Larkin (Mauritius) by Authority armed security guard John Johnson (Johnson) on the grounds of Cochran Gardens, an Authority housing project. Larkin, Mauritius's mother, sued under 42 U.S.C. § 1983, alleging that the Authority violated Mauritius's due process rights through its policy of failing adequately to train its security guards.

A. *The August 16, 1999, Incident*

On the evening of August 16, 1999, Johnson was on duty at the Cochran Gardens complex. He and another security guard responded to a call from a third guard informing them that a fight was in progress in the courtyard and requesting that

_____

[1]The Honorable Donald J. Stohr, United States District Judge for the Eastern District of Missouri.

they assist him in dispersing the crowd. At the time of the incident, Johnson wore his uniform and utility belt and he carried his standard-issue handcuffs and .38 caliber Smith & Wesson revolver.

The three security guards approached the assembled group. At this point, accounts of what happened vary greatly. The guards stated that a fight was underway; that Mauritius and Johnson struggled when Johnson attempted to separate some of the combatants; that Mauritius repeatedly stuck Johnson; that Mauritius reached for Johnson's gun and Johnson resisted; and that during the struggle over the gun, Johnson shot and killed Mauritius. Other witnesses stated that Mauritius and the others allegedly involved in the fight were actually just "play boxing" and that Johnson shot Mauritius without justification simply because Mauritius would not follow Johnson's directions.

St. Louis police took statements from the security guards and numerous other witnesses. Johnson was taken into custody and later pled guilty to voluntary manslaughter. At his plea hearing, he admitted that he "knowingly or with the purpose to cause serious physical injury to Mauritius Larkin, caused his death by shooting him."

B. *The Authority Training Policy*

Johnson began his employment as a security guard at the Cochran Gardens complex in 1996. In 1998, the Authority took over control of Cochran Gardens and Johnson became an Authority employee. At the time of the incident, Johnson was a armed security guard, having been licensed by the St. Louis City or County Police Departments since 1993.[2]

---

[2]Johnson was licensed from 1993 to the time of the incident by the St. Louis City Police Department, the St. Louis County Police Department, or both. The licensure requirements for both departments are the same.

At the time of the incident, the Authority employed only off-duty police officers and licensed armed security guards. The Authority did not require or provide additional training for its guards. Johnson had no other training than that which he received when initially licensed and when he periodically renewed his license.

Johnson received his license after taking a three-day course, which included both classroom and firearms training and testing. At the time of this initial training, and with each renewal of his license, Johnson received a copy of the licensing authority's rules and regulations for security guards, which outlines the duties and powers of private security guards. The rules and regulations incorporate the Missouri regulation governing the use of deadly force by security guards, which states that a security guard may discharge his firearm only when necessary to defend himself or another person from death or serious bodily injury when attacked.

II.

We review de novo the district court's grant of summary judgment, viewing the facts in a light most favorable to the non-moving party: in this case, Larkin. Thompson v. Hubbard, 257 F.3d 896, 898 (8th Cir. 2001). Summary judgment is appropriate where there is no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law. Id.

The Authority can be liable under Section 1983 for constitutional violations resulting from its failure adequately to train its employees, City of Canton v. Harris, 489 U.S. 378, 380 (1989); S.J. v. Kansas City Public School Dist., 294 F.3d 1025, 1029 (8th Cir. 2002), if the failure to train rises to the level of "deliberate indifference" to the people's rights. S.J., 294 F.3d at 1029 (quoting Thelma D. ex. rel. Delores A. v. Board of Educ., 934 F.2d 929, 934 (8th Cir. 1991)). For her claims to survive a motion for summary judgment, Larkin must provide evidence that the Authority was on notice that its training procedures "were inadequate and likely to result in violation of constitutional rights." Id. (quoting Thelma D., 934 F.2d at 934).

If on notice of the inadequacy, the Authority's failure to address it amounts to deliberate indifference. There are two ways Larkin may prove notice. First, she may show that the failure to train "is so likely to result in a violation of constitutional rights that the need for training is patently obvious." Id. (quoting Thelma D., 934 F.2d at 934). Second, she may show that "a pattern of misconduct indicates that the [Authority's] responses to a regularly recurring situation are insufficient to protect the [people's] constitutional rights." Id. (quoting P.H. v. School Dist. of Kansas City, 265 F.3d 653, 660 (8th Cir. 2001)).

We are concerned with the Authority's training policy, not with how Johnson absorbed the training. "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the [Authority], for the officer's shortcomings may have resulted from factors other than a faulty training program. It may be, for example, that an otherwise sound program has occasionally been negligently administered." City of Canton, 489 U.S. at 390-91 (internal citations omitted). "The issue in a case like this one … is whether the training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent 'city policy.'" Id. at 390. We must focus "on the adequacy of the training program in relation to the tasks the particular officers must perform." Id.

In ruling on the motion for summary judgment, the district court assumed that a constitutional violation had occurred. It then turned to the question whether the assumed violation was the result of an inadequate training policy. In determining whether there was evidence that the Authority was on notice that the training was inadequate given the particular circumstances faced by the officers at Cochran Gardens, the district court held that Larkin had failed to establish an issue of material fact. The district court noted that Larkin's expert did not know if anyone other than Mauritius had been shot at Cochran Gardens and that there was no testimony that security guards at Cochran Gardens were regularly faced with such situations. The district court accordingly concluded that, as a matter of law, "it was reasonable for

the Housing Authority to rely on the adequacy of the training provided for licensing." We agree.

Because the Constitution may require more training for some officers than for others, the Authority may not be protected from liability simply by relying on the requirements of the licensing agency. Id. (holding that we must look to "adequacy of the training program in relation to the tasks the particular officer[] must perform"). But the burden is on Larkin to proffer evidence establishing that conditions were such that the officers at Cochran Gardens needed additional training. She has failed to meet this burden. Johnson testified at his deposition that his duties at Cochran Gardens included patrolling in the complex's buildings and facilities, interdicting drug activities, and protecting tenants from harmful situations. He stated that he had the authority to arrest those who committed crimes, to search for and seize evidence in connection with an arrest, and to use lethal force where there "would be bodily harm or more serious" harm. But there was no evidence that these tasks were any different from those which all armed security guards are expected to be able to perform, and are, in fact, trained to perform.

Dr. James Fyfe, Larkin's expert in criminal justice, testified that security guards at housing projects in New York, Oakland, and Philadelphia receive many times the amount of training required for licensure and employment as an Authority armed security guard in St. Louis, but he did not testify that conditions in those cities were comparable to those at Cochran Gardens. Furthermore, he did not testify that the additional training received by security guards in New York, Oakland, and Philadelphia was necessary in relation to their duties.

Johnson stated that Cochran Gardens was a dangerous place, where violent crimes, drug crimes, and burglary often occurred. But these were general assertions that lacked any reference to particular crimes occurring at particular times. Conclusory statements about the conditions at Cochran Gardens and the duties of its

security guards are not sufficient for Larkin to meet her burden at summary judgment. Accordingly, we conclude that a reasonable juror could not find that the Authority's reliance on the training provided for licensure was inadequate, given the lack of evidence that Cochran Gardens' officers were required to perform unusually challenging duties under unusually challenging conditions.

Turning to the "patently obvious" prong of the City of Canton analysis, we disagree with Larkin's contention that the district court failed to consider all of the evidence bearing on her claim that the Authority's decision to rely on the training given at licensing was "so likely to result in a violation of constitutional rights that the need for training is patently obvious." S.J., 294 F.3d at 1029 (quoting Thelma D., 934 F.2d at 934). We read the district court's review of the evidence as rejecting the possibility that the inadequacy was so obvious that actual notice was not necessary. There is no evidence that Cochran Garden's security guards are expected to perform more difficult tasks under more difficult circumstances than those all licensed armed security guards are expected to be able to perform. A reasonable juror could not find, from the evidence provided, that a violation of constitutional rights was inevitably going to occur at Cochran Gardens. Although Dr. Fyfe did testify that the three days of training Johnson received, when coupled with the type of situations he could expect to see at Cochran Gardens, made "it inevitable that those situations will be mishandled and that a tragedy will occur," he never testified that the inevitability would have been patently obvious to the Authority. Thus, no reasonable juror could find, after considering the evidence regarding the nature of the property and the circumstances regularly faced by the security guards, that the Authority had actual or constructive notice of any inadequacy of the training it provided to the guards.

The summary judgment order is affirmed.

_____