# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2700

_____

| | | |
|---|---|---|
| Brittany Ann Plamp, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Mitchell School District No. 17-2, | * | District of South Dakota. |
| | * | |
| Appellee, | * | |
| | * | |
| Andrew Tate, | * | |
| | * | |
| Third Party Appellee. | * | |

_____

Submitted: March 11, 2009
Filed: May 12, 2009

_____

Before MURPHY, MELLOY, and SHEPHERD, Circuit Judges.

_____

MELLOY, Circuit Judge.

Brittney Plamp filed this suit against the Mitchell School District ("School District") after she was battered by one of her high-school teachers, Andrew Tate. Plamp asserted claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681–88; a constitutional civil-rights claim under 42 U.S.C. § 1983; and a state-law battery claim based on a South Dakota vicarious-liability law. The School

District filed a third-party, state-law-based complaint against Tate for failure to report, failure to comply with School District policy, contribution, and employee misconduct.

The district court[1] granted summary judgment in favor of the School District as to Plamp's § 1983 claim. The district court retained jurisdiction over the remaining claims and held a jury trial. At the close of its case, the School District moved for judgment as a matter of law on Plamp's Title IX claim, which the district court granted. Upon submission of the remaining claims, the jury found that while Tate had battered Plamp, the School District was not vicariously liable for that battery. Plamp appeals, arguing that the court erred with respect to its disposition of the Title IX and § 1983 claims. Plamp further argues that the adverse vicarious-liability verdict was not supported by the evidence. Finally, Plamp argues that the court erred in refusing to instruct the jury that it was prohibited from considering the source of any potential damage payment to Plamp and erred in excluding certain evidence relevant to the § 1983 and Title IX claims. We affirm the decisions of the district court and the jury's verdict.

I.

Plamp was a student at Mitchell High School from Fall 2002 until her graduation in Spring 2006. Tate had been employed at the school since 1988, and in addition to teaching an American government course, he was the boys wrestling and golf coach. While Plamp was acquainted with Tate because her boyfriend was a wrestler, the first time that she was in one of Tate's classes was during the 2005–06 school year. Tate's harassment of Plamp began while she was a student in that class.

Tate was aware that Plamp suffered from anorexia nervosa and used that information as pretext to engage in inappropriate behavior. Plamp testified that Tate

---

[1]The Honorable John E. Simko, United States Magistrate Judge for the District of South Dakota, sitting by the parties' consent. See 28 U.S.C. § 636(c).

would often call her to his desk during class while others were engaged in group work and question her about her eating disorder and her treatments for the illness. On one occasion, Tate requested that Plamp bring in a photograph of herself with few clothes on so that he could see signs of her anorexia. In addition to these comments and requests, Plamp testified that Tate would caress her shoulders and once made a statement about her "knockout body." He also told Plamp that she should eat more so that her breasts were not so disproportionate to her "skinny" body. At the time, Plamp kept most of what Tate said to herself; although, she did mention his comment about her "knockout body" to her mother sometime in the Spring of 2006.

On May 8, 2006, after Plamp had missed Tate's class for a doctor's appointment, Tate requested that she come to his room early the next day. When she entered his classroom the next morning, Tate began talking about his familiarity with eating disorders, and he requested that Plamp "come over" to him because he wanted "to see the signs of [her] being anorexic." In an area of the room not visible to those outside of the classroom, Tate proceeded to batter Plamp. Tate then attempted to engage Plamp in a conversation about her sex life and sexual preferences. No one entered the room during their encounter. When the bell rang to indicate the beginning of morning classes, Tate told Plamp that he wanted her to return the next morning so that he could weigh her without any clothing. He also told Plamp to refrain from mentioning their meeting to anyone, including her parents and boyfriend. That same day, however, Plamp revealed to her best friend and boyfriend what had happened. Two days later, on May 11, she told her mother and father. Plamp's parents immediately reported Tate's conduct to the School District's superintendent, Dr. Joseph Graves. Both Plamp's mother and Superintendent Graves called the police. Graves immediately suspended Tate and refused to allow him on school property without a police escort. The School District eventually terminated Tate.

It is undisputed that May 11 was the first time that the School District was made aware of Tate's harassment of Plamp. The testimony and evidence admissible at trial,

-3-

however, indicated that there were occasional concerns about Tate's behavior throughout his years as a teacher. The district court admitted evidence of three specific instances at trial. First, sometime around 1995, an anonymous man spoke with Judy Thiesse, the school's guidance counselor. The man claimed that his fiancée (who was a former student at Mitchell High School) was having sex-related problems because of her experiences with Tate. Thiesse referred the man to the then principal, Terry Aslesen. Aslesen testified that the man wanted a male teacher fired, but he refused to tell Aslesen the name of the teacher, what class the teacher taught, or the name of his fiancée. The man would not discuss his fiancée's problem in further detail and left the school after Aslesen said that he would need more information in order to act on the man's concerns.

The second instance occurred sometime in 2000. At that time, a female student complained to Thiesse that she felt "uncomfortable" in Tate's class. Thiesse accompanied the student to the then and current principal, Yvonne Palli's, office to talk about the matter further. While in Palli's office, the student refused (or was unable) to articulate why she was uncomfortable in Tate's class. As an accommodation, the student was allowed to sit at the desk closest to the door in Tate's room. The school also provided her with a permanent hall pass. More recently, during the 2004–05 school year, another female student complained to Thiesse that Tate made her feel uncomfortable in class. This student was able to describe her discomfort in greater detail than the previous student and informed Thiesse that Tate was using instances of graphic sexual violence against women to teach various parts of his class. She expressed concern that Tate appeared to garner pleasure at this. Thiesse took the student's complaint to Palli, and Palli promised to speak with Tate. According to Palli's testimony, she informed him that his lessons were making students uncomfortable. The student did not complain to Thiesse or Palli further.

Plamp sought to introduce additional evidence of Tate's allegedly inappropriate behavior in the form of testimony from various teachers and students. Such evidence

included a student's statement that she and two other students had discussed Tate's sexual advances and that a teacher had overheard their complaints; a teacher's testimony that female students had told him that Tate looked down female students' shirts when he passed out papers, that he had heard students call Tate "creepy," and that students told him that Tate gave better grades when female students "dressed like [] whore[s]"; another teacher's testimony that students had called Tate a "pervert," that the teacher's own daughter had complained about Tate's inappropriate comments, and that Thiesse had stopped him in the hall and told him that many females had complained about Tate; a student's testimony that Thiesse had told the student that there had been "problems with Tate in the past" and that Thiesse had told Aslesen about the problems, but that Aslesen had done nothing; and evidence that the School Board President had sent Aslesen and Tate photographs of partially nude adult-female golfers via his official school e-mail account. The district court excluded much of the testimony on the grounds that it failed to establish that the legally relevant persons had notice of Tate's misconduct or a pattern of unconstitutional behavior generally. It further determined that the remaining evidence was inadmissible hearsay.

The School District has had a sexual-harassment policy since 1993, and that policy was in effect at all times relevant to this action. The School District reviewed and revised the policy in 1994, 1998, and 2000. The School District reviewed the policy again in 2003. The School District provides School District staff members with a copy of that policy at the beginning of each school year. The district court found the School District's policy and that of the Associated School Boards of South Dakota to be almost identical. In addition to the written policy, the School District staff members are provided with workshops and training on sexual harassment, child abuse, and all the relevant reporting requirements under state law. Such polices are also posted in the administrative offices and staff areas of each school in the School District. The School District also has a coordinator responsible for ensuring proper compliance with Title IX. The School District further operates with a student-grievance procedure that is contained within the student handbook. The handbook

contains information about the School District's sexual-harassment policy, and students received training about that policy during the 2004, 2005, and 2006 school years.

## II.

### A. Title IX Discrimination Claim

Federal Rule of Civil Procedure 50(a) allows a "district court to enter judgment against a party in a jury trial on a claim . . . that the party cannot maintain under the controlling law, so long as the party has been fully heard on the issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on the issue." Tatum v. City of Berkeley, 408 F.3d 543, 549 (8th Cir. 2005). This court reviews de novo the district court's decision to grant a motion for judgment as a matter of law. Id.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "For a school to incur liability under Title IX, it must be (1) deliberately indifferent (2) to known acts of discrimination (3) [that] occur under its control." Shrum ex rel. Kelly v. Kluck, 249 F.3d 773, 782 (8th Cir. 2001) (citing Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 642 (1999)). "An educational institution may be liable under Title IX for a teacher's sexual harassment of a student." Cox v. Sugg, 484 F.3d 1062, 1066 (8th Cir. 2007) (citing Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 281 (1998)). Such liability cannot stand, however, unless an appropriate person "'has actual knowledge of discrimination . . . and fails adequately to respond.'" P.H. v. Sch. Dist. of Kan. City, Mo., 265 F.3d 653, 661 (8th Cir. 2001) (quoting Gebser, 524 U.S. at 290). An "appropriate person" is one "who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf." Id.; Gebser, 524 U.S. at 290

("An 'appropriate person' under § 1682 is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination.").

The School District contends that judgment as a matter of law was proper because no "appropriate" school official had knowledge of Tate's discriminatory actions, and it did not act with deliberate indifference once it became aware of those actions. Plamp counters with two arguments. First, she claims that the district court erred by concluding that the school principals did not have actual knowledge of the harassment. Second, she asserts that the court erred by concluding that Thiesse and the school's teachers were not "appropriate persons" within the meaning of § 1682. Plamp contends that Thiesse and the school's teachers can serve as "appropriate persons" because the School District vests them with the ability to institute corrective measures by informing the school administration of any suspected harassment. In fact, they have a duty to report such conduct. Plamp argues that because school guidance counselors and teachers are "appropriate persons," the court erred in failing to admit certain evidence of their knowledge of Tate's actions. While we in no way condone Tate's behavior, we find Plamp's arguments unavailing.

We recognize that the administration of a school and the roles that various persons fill therein vary from district to district. As such, we do not pretend to fashion a bright-line rule as to what job titles and positions automatically mark an individual as having sufficient authority or control for the purposes of Title IX liability. See Murrell v. Sch. Dist. No. 1, Denver, Colo., 186 F.3d 1238, 1247 (10th Cir. 1999) ("Because officials' roles vary among school districts, deciding who exercises substantial control for the purposes of Title IX liability is necessarily a fact-based inquiry."). It is apparent from Supreme Court precedent, however, that school principals are considered "appropriate persons" in the Title IX analysis. See, e.g., Davis, 526 U.S. at 653 (discussing the principal's actual knowledge of harassment); Gebser, 524 U.S. at 291 (assuming without discussion that a high-school principal was an appropriate person under the statute); see also Murrell, 186 F.3d at 1247 ("We find

-7-

little room for doubt that the highest-ranking administrator at [the high school] exercised substantial control of [the teacher] and the [high school] environment during school hours, and so her knowledge may be charged to the School District.").

Both Principals Palli and Asleson possessed the power to institute corrective measures and stop Tate's discrimination during their respective tenures by seeking to reprimand, further supervise, suspend, or even fire Tate. Plamp has failed to establish, however, that either of these individuals possessed actual knowledge of Tate's discriminatory conduct toward her or anyone else. P.H., 265 F.3d at 661–63. As recounted above, the admissible evidence only established that an anonymous man made a vague complaint against Tate sometime around 1995 and that two female students were "uncomfortable" in Tate's class. One of those students was unable or unwilling to articulate why she was uncomfortable, and when the other student expressed particularized concerns, Palli spoke with Tate about those concerns. These vague complaints are insufficient to support a finding that either Palli or Asleson had actual knowledge of Tate's discriminatory actions. See, e.g., Gebser, 524 U.S. at 291 ("[A] complaint from parents of other students charging only that [the teacher] had made inappropriate comments during class" was "plainly insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student."); P.H., 265 F.3d 662–63 (determining that complaints that could be construed as "showing favoritism" but that did not "voice[] any suspicions of sexual abuse" were insufficient to establish knowledge of such abuse). With respect to Plamp specifically, it is undisputed that Plamp did not tell anyone about her experiences with Tate other than her friend, boyfriend, and mother. When her mother told Superintendent Graves, he took immediate action.

Additionally, while we do not hold that school guidance counselors and teachers are always without the authority necessary to institute corrective measures or lack sufficient control to take remedial action, the record in this case does not support a finding that Theisse or the Mitchell High School teachers were "appropriate persons" within the meaning of the statute. See P.H., 265 F.3d at 662 ("There is an

insufficient factual basis. . . to consider [the] claim that a teacher who is not the wrongdoer but who has a duty to report might have sufficient control to take remedial action."). Plamp has presented no evidence that the teachers who testified in depositions regarding various concerns that students had raised about Tate had control over Tate. She has also presented no evidence that these teachers were vested with special remedial authority regarding sexual-harassment claims generally so as to empower them to stop the harassment. And, as a result, their knowledge of Tate's actions is of little relevance to the disposition of the case. See P.H., 265 F.3d at 662; cf. Davis, 526 U.S. at 641–43 (indicating that in the context of student-on-student harassment, an appropriate person is someone with the ability to "remedy" the abuse).

Furthermore, Plamp has failed to establish that the guidance counselor, Thiesse, was an appropriate person with authority to institute corrective measures.[2] Plamp presented the following evidence in support of her claim that Thiesse had such authority: (1) students regularly went to Thiesse with complaints about teachers and coursework, thus implying that they saw her as having the power to help; (2) Principal Palli was unapproachable; and (3) Thiesse was required by the sexual-harassment policy to report suspected instances of abuse or harassment to the administration. This evidence, however, is insufficient to establish that Thiesse had remedial powers of the type required to find the School District liable under Title IX. There was no evidence that Thiesse had the power to stop or prevent the harassment from occurring by taking actions such as suspending Tate from teaching, curtailing his teaching or other school-related privileges, requiring him to attend sessions or meetings about his behavior, or ensuring that he was under greater supervision. See Warren ex rel. Good

_____

[2] Plamp argues that "there is no evidence that Thiesse did not have the authority to end the harassment or to conduct an investigation," but it was Plamp who bore the burden to put forth evidence that Thiesse had such authority. It was not the School District's burden to show that Thiesse did not. Lam v. Curators of the Univ. of Mo. at Kan. City Dental Sch., 122 F.3d 654, 657 (8th Cir. 1997) (plaintiff has burden to establish prima facie case).

v. Reading Sch. Dist., 278 F.3d 163, 173 (3d Cir. 2002) (finding a guidance counselor was not an appropriate person "cloaked with sufficient authority . . . during any relevant time" despite the fact that the counselor was charged with handling "referrals for abuse and assumed the role of principal when [the principal] was not in the building" as part of the regular job duties); cf. Murrell, 186 F.3d at 1247–48 (refusing to foreclose the possibility that counselors and teachers could be "appropriate persons" in the context of student-on-student harassment; provided, however, that the teachers "exercised control over the harasser and the context in which the harassment occurred").

Contrary to Plamp's claim, Title IX does not contemplate a definition of "corrective measures" so broad as to include the mere ability to report suspicions of discriminatory conduct to someone with the authority to stop the abuse or control the harasser. Such an approach would expand the scope of Title IX liability beyond that which Congress intended and would functionally open all educational institutions to liability based on a theory of respondeat superior or constructive notice—a move that the Supreme Court has clearly stated the statute does not contemplate. Gebser, 524 U.S. at 286; cf. Davis, 526 U.S. at 641("[A] recipient of federal funds may be liable . . . only for its own misconduct."). After all, each teacher, counselor, administrator, and support-staffer in a school building has the authority, if not the duty, to report to the school administration or school board potentially discriminatory conduct. But that authority does not amount to an authority to take a corrective measure or institute remedial action within the meaning of Title IX. Such a holding would run contrary to the purposes of the statute. See Gebser, 524 U.S. at 289 ("Presumably, a central purpose of requiring notice of the violation 'to the appropriate person' and an opportunity for voluntary compliance before administrative enforcement proceedings can commence is to avoid diverting education funding from beneficial uses where a recipient was unaware of discrimination in its programs and is willing to institute prompt corrective measures.").

-10-

In conclusion, we do not hold that guidance counselors and school teachers are never "appropriate persons" for the purposes of finding a school district liable for discrimination under Title IX; however, the record here does not establish that Theisse and these particular teachers were vested with sufficient "authority to address the alleged discrimination and to institute corrective measures." P.H., 265 F.3d at 662. Accordingly, we affirm the district court's grant of judgment as a matter of law regarding Plamp's Title IX claim.

B. 42 U.S.C. § 1983 Claim

"We review an order granting summary judgment *de novo*, viewing the evidence in the light most favorable to the nonmoving party." S.J. v. Kan. City Mo. Pub. Sch. Dist., 294 F.3d 1025, 1027 (8th Cir. 2002) (quotation omitted). "A school district can be liable for civil-rights violations under § 1983 either for failing to receive, investigate, and act upon complaints of [unconstitutional conduct] or for failing to train its employees to prevent or terminate [unconstitutional conduct]." P.H., 265 F.3d at 658. Plamp contends that the district court erred in granting summary judgment in favor of the School District on her § 1983 claim because issues of material fact remain as to whether the School District had notice of sexual harassment at the school and failed to act upon it and whether the School District failed to train its employees to prevent or report such harassment. We disagree.

In order to defeat summary judgment on her § 1983 failure-to-act claim, Plamp was required to present evidence that (1) there was a "continuing, widespread, persistent pattern of unconstitutional misconduct," (2) the school's "policymaking officials" were deliberately indifferent to or tacitly authorized such conduct after gaining knowledge of such conduct, and (3) Plamp "was injured by acts pursuant to the [school's] custom." Thelma D. v. Bd. of Educ., City of St. Louis, 934 F.2d 929, 933–34 (8th Cir. 1991).

Despite the School District's arguments to the contrary, Plamp presented sufficient evidence to establish that Tate was engaging in unconstitutional conduct. See Wright v. Rolette County, 417 F.3d 879, 884 (8th Cir. 2005) ("Sexual harassment by state actors violates the Fourteenth Amendment and establishes a section 1983 action." (quotation and alteration omitted)); P.H., 265 F.3d at 658 ("It is well-settled that the Due Process Clause of the Fourteenth Amendment protects the liberty interest of a child in public school from sexual abuse." (quotation omitted)).

Even given this finding, however, Plamp has failed to raise an issue of material fact as to whether the relevant policymaking officials had knowledge of a continuing, widespread, persistent pattern of unconstitutional misconduct. First, Plamp has failed to present sufficient evidence of a pattern of misconduct. As outlined above, the evidence of Tate's unconstitutional conduct was limited and vague. The three concrete complaints were scattered over approximately twelve years and contained little in terms of content that could raise more than a suspicion of sexual harassment. See P.H., 265 F.3d at 659 (considering relevant the time span and the detail of the complaints). There was also no evidence that other teachers or school personnel had been disciplined for misconduct over the years. Plamp cites the evidence that the district court excluded on hearsay and relevancy grounds as supporting the widespread nature of the discrimination, and she claims that the court effectively prevented her from making out a case based on circumstantial evidence. With regard to this evidence, however, Plamp fails to overcome the barriers of the hearsay rule, and, thus, the evidence cannot defeat summary judgment. See Johnson v. Baptist Med. Ctr., 97 F.3d 1070, 1073 (8th Cir. 1996).

Second, even assuming that Plamp's evidence was sufficient to raise a question of fact as to whether there was a pattern of unconstitutional conduct, she fails to raise an issue of fact as to whether the relevant policymaking body had notice of Tate's actions, not to mention a continuing, widespread, persistent pattern of unconstitutional misconduct generally. Plamp argues that the relevant policymaking body with notice

-12-

for purposes of § 1983 liability is not limited to the School District's School Board but also includes lower-level officials at Mitchell High School. Alternatively, Plamp claims that even if the relevant body is limited to the School Board, the lower-level officials' knowledge can be imputed to that body. Plamp claims that in either instance, based on her imputed-knowledge theory, the district court improperly excluded evidence of that knowledge. Plamp's arguments are unavailing.

In this case, the in-house school administration cannot be considered a "policymaking body" for the purposes of the notice requirement under § 1983. While we have not explicitly addressed the issue, we have never found such an entity to be the relevant policymaking body. See Thelma D., 934 at 933 ("The parties appear to be in agreement for the purposes of this summary judgment motion that only the Board has final policymaking authority."); P.H., 265 F.3d at 659–60 (referring to the "Kansas City School District" or "school district" as relevant body for a § 1983 claim rather than the officials at the school). Furthermore, in Thelma D., we warned of the danger in having school hierarchies structured so as to shield information from the school board in order to avoid liability under § 1983. See Thelma D., 934 F.2d at 936 ("[T]his court will closely scrutinize bureaucratic hierarchies which, in their operation, tend to insulate . . . policymaking officials from knowledge of events which may subject them to § 1983 liability."). If Plamp were correct in her argument that liability can be predicated, in all circumstances, on the knowledge of an entity other than the school board, then our warning in Thelma D. would be rendered somewhat meaningless.

Furthermore, Plamp has presented no evidence that convinces us that, despite the existence of the School Board, the in-house school administration was, in fact and practice, the final policymaking body. For example, the evidence at trial indicated that while the School District's building principals and assistant principals were responsible for revising and reviewing the student handbooks, they were required to do so in consultation with the Superintendent. It was also the School Board that was

-13-

ultimately responsible for approving policies and any subsequent amendments to those policies. Cf. Ware v. Jackson County, Mo., 150 F.3d 873, 886 (8th Cir. 1998) (finding an individual was a policymaker on personnel matters under § 1983 based on the fact that he was the director of department of corrections; he had authority to promulgate the department's policy, which included the rules of conduct for personnel; he had the authority to implement such policy; he exclusively handled the disciplinary actions; and there was no proven mechanism through which a higher authority had the ability to review his discipline decisions); McGautha v. Jackson County, Mo., Collections Dept., 36 F.3d 53, 56 (8th Cir. 1994) ("Although [the official] headed the collections department and was responsible for its day-to-day operations, neither he nor [a fellow employee] dictated final policy. They merely exercised their discretion in carrying out officially pronounced county policy. Their actions were reviewable by the county executive and were also subject to written county policy.").

South Dakota law further supports the finding that the in-house officials' knowledge was insufficient for notice under § 1983, as school boards are the designated policymaking bodies in the state. See S.D. Codified Laws § 13-8-1 ("The school board is . . . to serve as the governing board of a school district for the purpose of organizing, maintaining, and locating schools and for providing educational opportunities and services for all citizens residing within the school district."); id. § 13-8-39 ("[T]he school board has general charge, direction and management of the schools of the district and control and care of all property belonging to it.").

Concluding that the in-house officials at Mitchell High School were not the appropriate policymaking body in this case, we also find that the relevant entity here, the School Board or Superintendent, did not have knowledge of a continuing, widespread, persistent pattern of unconstitutional misconduct at the school. There is no evidence that the School District knew of Tate's actions toward Plamp. Additionally, there is also no evidence that it had knowledge of any other complaints

-14-

made against Tate or any other teacher in the past. Plamp's argument that knowledge of Tate's unconstitutional conduct can be imputed to the School Board also fails. "Imputation of constructive knowledge requires a showing that the underlying unconstitutional misconduct was so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of it." Thelma D., 934 F.2d at 933 (internal quotation and alteration omitted). As previously established, Plamp failed to raise an issue of material fact as to this question. In sum, because of the absence of notice to a relevant policymaking body, the district court was correct in determining that it could not, as a matter of law, attribute to the School District Tate's unconstitutional misconduct. See, e.g., Jane Doe "A" v. Special Sch. Dist. of St. Louis County, 901 F.2d 642, 646 (8th Cir. 1990).

Plamp further argues she has established a claim under § 1983 because the School District failed to train specifically for the detection of teacher-on-student sexual abuse and harassment. "To establish its failure to train theory, [the plaintiff] must show that the Board's 'failure to train its employees in a relevant respect evidences a deliberate indifference' to the rights of the students." Thelma D., 934 F.2d at 933 (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 389 (1989)). The policymaking body must have "notice that its procedures were inadequate and likely to result in a violation of constitutional rights." Thelma D., 934 F.2d at 934. There are two ways that Plamp could have established such notice, and we agree with the district court that for the purposes of avoiding summary judgment she has satisfied neither.

First, notice can be implied when a "failure to train officers or employees is so likely to result in a violation of constitutional rights that the need for training is patently obvious." Id. As outlined above, the School District had sexual-harassment policies and reporting procedures in place. While Plamp presented some evidence that personnel never received training specifically addressing teacher-on-student harassment, such testimony only raises concerns about the administration of the

-15-

Board's policies. This would, at most, raise a question about whether the program was negligently administered, but it is not alone a sufficient basis upon which to find liability for failure to train. See Harris, 489 U.S. at 390–91 ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. It may be, for example, that an otherwise sound program has occasionally been negligently administered." (internal citations omitted)); Thelma D., 934 F.2d at 934–35 (finding that a principal's claim that he was never trained was insufficient to invoke liability where "the record clearly indicates that the Board [had] developed and implemented polices and procedures for handling complaints of sexual abuse").

Second, Plamp could have shown that a pattern of violations put the policymaking body on notice that the school's response to regularly occurring situations was insufficient to prevent the unconstitutional conduct. Thelma D., 934 F.2d at 935. Again, however, Plamp presented no evidence that the policymaking body was aware that training procedures were inadequate because it, in fact, had no notice of the on-going problem. Id. ("[T]he Board simply cannot be said to have acquiesced in something of which they had no knowledge . . ."). As a result, we find that Plamp failed to raise an issue of material fact as to whether the School District failed to train its employees to prevent or report sexual harassment, and we affirm the district court's grant of summary judgment in favor of the School District with respect to Plamp's § 1983 claims.

C. Vicarious Liability for Battery Under State Law

Plamp additionally claims that insufficient evidence supported the jury's determination that the School District was not vicariously liable for Tate's battery. We disagree. "A jury verdict is entitled to extreme deference, and we will not set it aside unless no reasonable jury could have reached the same verdict based on the evidence submitted." Craig Outdoor Adver., Inc. v. Viacom Outdoor, Inc., 528 F.3d

-16-

1001, 1009 (8th Cir. 2008), <u>cert. denied</u>, 129 S.Ct. 1000 (2009) (internal citation omitted). When reviewing the sufficiency of the evidence, "we consider the evidence in the light most favorable to the jury's verdict." <u>Id.</u>

We addressed the scope of South Dakota's law on vicarious liability in <u>Red Elk v. United States</u>, 62 F.3d 1102 (8th Cir. 1995), and we determined that "'foreseeability' is central to the analysis" of whether the complained-of acts occurred within the scope of employment such that an employer can be held vicariously liable for the actions of its agent. <u>Red Elk</u>, 62 F.3d at 1107. Based on the evidence presented, a reasonable jury could have found that Tate was acting outside the scope of his employment when he battered Plamp and that the School District could not have foreseen his actions. Evidence indicated that Tate was not authorized to touch students in his class. He was not authorized to counsel his students regarding health issues, such as eating disorders. There is nothing to indicate that Tate had spoken with the school administration about his concerns over Plamp's appearance so as to cause concern. And, furthermore, there is no evidence that there were similar instances of harassment or abuse in the past that would have indicated to the School District that a teacher would engage in such behavior. <u>See</u> <u>Leafgreen v. Am. Family Mut. Ins. Co.</u>, 393 N.W.2d 275, 280–81 (S.D. 1986) ("[F]oreseeable is used in the sense that the employee's conduct must not be so unusual or startling that it would be unfair to include the loss caused by the injury among the costs of the employer's business."). We conclude, therefore, that there was sufficient evidence for a reasonable jury to have found that Tate acted outside the scope of his employment. We refuse to disturb the jury's verdict as to the School District's vicarious liability.

D. Jury Instruction Regarding Source of Payment

Plamp's final contention is that the district court erred in refusing to instruct the jury that it was not permitted to consider the source of any potential damage payment to Plamp. Plamp argues that a source-of-payment instruction was necessary to ensure that the jury would not find for the School District simply out of concern that an

award for Plamp would take money from the public coffers. We review the court's refusal to issue a jury instruction for abuse of discretion, <u>Boesing v. Spiess</u>, 540 F.3d 886, 890 (8th Cir. 2008), and we find no such abuse here. While an appeal to the jury's self-interest would have been improper, there is nothing in the record to indicate that the School District acted in a manner so as to draw attention to the fact that the jury, as taxpayers, would ultimately be responsible for financing any damage award. <u>Cf.</u> <u>Byrns v. St. Louis County</u>, 295 N.W.2d 517, 520–21 (Minn. 1980) (finding improper a counsel's reference to the fact that the damage amount of any verdict would come out of taxpayers' money).

Additionally, in an effort to guard against potential prejudice, the district court granted Plamp's motion in limine to prohibit argument on source of payment in the event that the jury returned a verdict in Plamp's favor. We agree with the district court's conclusion that absent an appeal to the jury's self-interest as taxpayers, a source-of-payment instruction would simply "inject" into deliberations "an issue that otherwise the jury might not even think about." The decision not to issue the instruction was well within the court's discretion.

III.

For the foregoing reasons, we affirm. Furthermore, after consideration of Plamp's motion to strike portions of the School District's joint appendix under Federal Rule of Appellate Procedure 30(a)(2), we find it without merit and deny the motion. <u>See</u> <u>Stanton v. St. Jude Med. Inc.</u>, 340 F.3d 690, 695 (8th Cir. 2003).

_____