# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2074

_____

James P. Stephenson,                        *
in his capacity as Trustee for             *
the Estate of MJK Clearing, Inc.,          *
                                            *
            Appellee,                       *
                                            *    Appeal from the United States
      v.                                    *    District Court for the
                                            *    District of Minnesota.
Ramy El-Batrawi,                            *
                                            *
            Appellants.                     *

_____

Submitted: January 14, 2008
Filed: April 30, 2008

_____

Before WOLLMAN and SMITH, Circuit Judges, and GRITZNER,[1] District Judge.

_____

GRITZNER, District Judge.

Ramy El-Batrawi (El-Batrawi) appeals the decisions of the district court denying El-Batrawi's motion to set aside default, granting a motion for default judgment in favor of the Trustee for the Estate of MJK Clearing, Inc. (MJK Trustee) and against El-Batrawi, and entering a money judgment against El-Batrawi in the

_____

[1]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa, sitting by designation.

amount of $67.5 million. We affirm in part, and remand for further proceedings regarding the determination of the damages.

## I.     BACKGROUND

The financial transactions underlying the claims herein are many, intricate and complex. For purposes of this appeal from the entry of default and a default judgment, the matter may be addressed in summary fashion from the allegations below.

MJK Clearing, Inc. (MJK) was a Minneapolis-based securities clearing company that entered into stock-loan transactions involving GenesisIntermedia, Inc. (GENI) stock. Stock lending involves a lending broker, who lends shares of stock to a borrowing broker, who in turn provides the lending broker cash collateral equal to the market value of the borrowed stock. If the price of the stock goes up while the stock is on loan to the borrowing broker, the borrowing broker must provide the lending broker with more cash collateral to cover the increase in price. Conversely, if the value of the stock goes down, the lending broker must return some of the cash collateral to the borrowing broker. This transfer of cash collateral based on the price of the stock is called "marking to the market."

GENI's primary focus was making infomercials and installing internet kiosks in shopping centers. El-Batrawi was the CEO, chairman of the board, and a major stockholder in GENI. The GENI stock-loan scheme commenced in the summer of 1999; GENI stock passed through several securities lending companies and ultimately landed at Deutsche Bank SL. In a typical GENI stock loan, El-Batrawi and Ultimate Holdings,[2] another major GENI shareholder, would lend GENI stock to Native Nations, which in turn loaned GENI stock to MJK; MJK in turn loaned GENI stock to other brokers/dealers, such as Maple Partners, which then loaned GENI stock to

_____

[2]Ultimate Holdings is an investment company that is owned by defendant Adnan Khashoggi.

-2-

Deutsche Bank SL, where the GENI stock would remain. Deutsche Bank SL would give the brokers/dealers, such as Maple Partners, the cash collateral for the stock. The cash collateral would then pass down the chain through the other brokers/dealers, until it reached the hands of El-Batrawi and Ultimate Holdings.

As the GENI stock sat at Deutsche Bank SL, and thus out of public circulation, the perpetrators of the scheme would manipulate the price of the stock by offering the few remaining public shares. As the price of the stock increased, the brokers/dealers in the chain marked to market, sending more cash collateral down the chain to El-Batrawi and Ultimate Holdings.

In the market atmosphere following the September 11, 2001, terrorist attacks, the market rigging could no longer be sustained, forcing Native Nations out of business and causing the GENI stock-loan scheme to collapse.[3] Native Nations did not return over $200 million in cash collateral it owed to MJK for the stock loans. Irrespective of Native Nations' failure to return the funds to MJK, MJK had an independent obligation to return the funds to the broker/dealer behind it in the chain. Unable to absorb this over $200 million loss, MJK contacted officials at the Federal Reserve Bank and almost immediately ceased operations. A SIPA[4] liquidation of MJK was commenced in the United States District Court for the District of Minnesota, and the entire liquidation proceeding was removed to the United States Bankruptcy Court for the District of Minnesota.

The MJK Trustee originally brought an adversary proceeding in the United States Bankruptcy Court for the District of Minnesota against various defendants,

---

[3]Deutsche Bank SL had been sending large amounts of cash to Native Nations, thereby providing Native Nations an ability to falsify its true net capital calculations and financial statements, thus maintaining business viability for Native Nations.

[4]Securities Investor Protection Act of 1970, 15 U.S.C. §§ 78aaa-lll.

including El-Batrawi and Deutsche Bank SL, alleging the defendants were jointly and severally liable in committing various violations of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-78nn; the Minnesota Securities Act, Minn. Stat. § 80A.40-.50; and Rackateer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. §§ 1961-1968; in addition to allegations of common law fraud, conspiracy to defraud, and violations of the Minnesota Consumer Protection Act, Minn. Stat. §§ 324-338. Thereafter, the MJK Trustee's action was transferred to the United States District Court for the District of Minnesota.

On November 5, 2002, the MJK Trustee served the complaint on El-Batrawi by first-class mail at 3040 Beckman Drive, Los Angeles, California (Beckman address). Proof of service was filed with the Bankruptcy Court on November 18, 2002.[5] The amended complaint was served on El-Batrawi at the Beckman address by first-class mail on November 22, 2002, and proof of service was filed on December 2, 2002. The mailings sent to the Beckman address were never returned to the MJK Trustee. Copies of the summons and amended complaint were also mailed by first-class mail to El-Batrawi at three additional addresses; each of these attempts were returned to the MJK Trustee indicating El-Batrawi no longer resided at those addresses, and no forwarding contact information was provided.

El-Batrawi did not appear to defend in the action after this service on the Beckman address. On April 30, 2003, the MJK Trustee filed for leave to serve El-Batrawi by publication, and on May 27, 2003, the district court granted the MJK Trustee's motion to serve El-Batrawi by publication in the Los Angeles Times once a week for four consecutive weeks.[6] Service by publication was completed on July

---

[5]Federal Rule of Bankruptcy Procedure 7004(b)(1) permits service by first-class mail to an individual's dwelling house.

[6]The record indicates a copy of the summons was published in the Los Angeles Times on May 30, 2003, June 6, 2003, June 13, 2003, and June 30, 2003.

27, 2003. El-Batrawi did not file or serve any pleading in response to the service by publication. On August 22, 2003, the MJK Trustee filed for entry of default against El-Batrawi, and the Clerk of Court entered default against El-Batrawi that same day.

In 2005, the MJK Trustee reached a settlement with the Deutsche Bank SL for $147.5 million in cash, waivers, and the withdrawal of certain claims valuing approximately $120 million, for a total settlement value of $267.5 million. According to the MJK Trustee, after reaching the Deutsche Bank SL settlement, approximately $67.5 million in uncompensated damages remained.

On April 7, 2006, and again on June 7, 2006, the MJK Trustee filed a motion for default judgment for the remaining $67.5 million in damages yet to be recovered by the MJK Trustee against El-Batrawi and other defendants who did not participate in the Deutsche Bank SL settlement agreement. Less than a week after the filing of the second motion for default judgment, but three and one-half years after service of the complaint and summons at the Beckman address, El-Batrawi made his first appearance in the case, filing a motion to set aside the default that had been entered against him in 2003. Without explanation of how he became aware of the MJK Trustee's action, El-Batrawi denied that he ever obtained actual notice and urged the district court to set aside the default against him, arguing he had meritorious defenses.

On January 26, 2007, the United States Magistrate Judge issued a Report and Recommendation, recommending El-Batrawi's motion to set aside be denied and the MJK Trustee's motion for default judgment be granted. After entertaining objections and responses to the Report and Recommendation, on March 8, 2007, the district court adopted the Report and Recommendation in its entirety. Judgment was entered on April 20, 2007, in the amount of $67.5 million against El-Batrawi and the remaining co-defendants, jointly and severally. El-Batrawi timely appealed.

El-Batrawi argues the district court abused its discretion in denying his motion to set aside default so he could make an appearance and defend the litigation pending in the district court, and that the district court erred in granting the MJK Trustee's motion for default judgment as against him and in entering a money judgment against him, jointly and severally with other defendants, in the amount of $67.5 million, plus post-judgment interest.

## II. DISCUSSION

### A. Entry of Default

We review the denial of a motion to set aside default for an abuse of discretion. Watkins v. Lundell, 169 F.3d 540, 543-44 (8th Cir. 1999). "The court may set aside an entry of default for good cause, and it may set aside a default judgment under Rule 60(b)." Fed. R. Civ. P. 55(c). When examining whether good cause exists, the district court should weigh "whether the conduct of the defaulting party was blameworthy or culpable, whether the defaulting party has a meritorious defense, and whether the other party would be prejudiced if the default were excused." Johnson v. Dayton Elec. Mfg. Co., 140 F.3d 781, 784 (8th Cir. 1998).

#### 1. Blameworthy or Culpable Conduct

In an effort to show he was not blameworthy or culpable, El-Batrawi claims he did not receive "actual" notice of the lawsuit, although counsel for El-Batrawi conceded at oral argument that service was legally effective. The district court, in adopting the Report and Recommendation of the Magistrate Judge in its entirety, concluded the MJK Trustee properly served El-Batrawi. The MJK Trustee mailed copies of the initial summons and complaint, and the amended complaint, to El-Batrawi at the Beckman address, pursuant to Federal Rule of Bankruptcy Procedure 7004. Because those documents were never returned to the MJK Trustee by the United States Postal Service, the law presumes El-Batrawi was effectively served. "The fact that the summons and complaint were mailed to the correct street address, city and state, combined with the evidence that they were not returned to the trustee . . .

constitute prima facie evidence of the validity of the service." In re Foos, 204 B.R. 545, 547-48 (Bankr. N.D. Ill. 1997); see also In re Ms. Interpret, 222 B.R. 409, 413 (Bankr. S.D.N.Y. 1998) ("Courts uniformly presume that an addressee receives a properly mailed item when the sender presents proof that it properly addressed, stamped, and deposited the item in the mail."); In re Thole, 31 B.R. 548, 550 (Bankr. D. Minn. 1983) (recognizing the strong presumption that letters duly mailed are duly received). In addition to the efforts of the MJK Trustee, the sworn affidavit of Elizabeth Fox (Fox), authorized process server for CIBC World Markets, Inc., a plaintiff in an action consolidated with the MJK Trustee case,[7] states that on October 4, 2004, she served an individual she recognized as El-Batrawi at the Beckman address.[8]

The MJK Trustee contacted El-Batrawi's business associates in an attempt to locate El-Batrawi's whereabouts. El-Batrawi's business associates provided no assistance. Counsel for the MJK Trustee asked attorney David C. Scheper, El-Batrawi's counsel in a related California class action, if Scheper would accept service of process on behalf of El-Batrawi. Mr. Scheper declined. Like the district court, we find it implausible that Mr. Scheper, El-Batrawi's attorney, upon being informed of the Minnesota action, would not inform his client of that lawsuit. Even more compelling toward this conclusion is the transfer of the California class action lawsuit pending against El-Batrawi to the District of Minnesota for consolidated pretrial proceedings.

After service on the Beckman address did not generate an appearance by El-Batrawi, the MJK Trustee also took the additional step of serving El-Batrawi by

---

[7]CIBC World Mkts., Inc. v. Deutsche Bank Sec., Inc., 309 F. Supp. 2d 637 (D.N.J. 2004).

[8]Fox stated she recognized El-Batrawi from a previous, unrelated encounter with El-Batrawi. Fox subsequently identified El-Batrawi as the person she served based on a photograph of El-Batrawi.

publication in the Los Angeles Times once a week for four successive weeks as permitted by the court. The MJK Trustee made a thorough investigation and inquiry into the whereabouts of El-Batrawi before resorting to service by publication.

The law presumes the documents mailed to the Beckman address were received by El-Batrawi, and his mere denial is insufficient to overcome this presumption. See In re Outboard Marine Corp., 359 B.R. 893, 898 (Bankr. N.D. Ill. 2007) ("[M]ere denial of receipt of the summons and complaint falls short of what is required to overcome the prima facie evidence of service."). El-Batrawi was also served by publication. Service by publication allows a case to move forward when other attempts at service fail to produce an appearance by a necessary party. El-Batrawi's attorney was fully aware of the existence of the pending action in Minnesota. And, the district court had a reasonable basis upon which to conclude El-Batrawi had actual notice through personal service of another of the consolidated cases.

The district court had more than enough information to conclude El-Batrawi had notice of the litigation through one or more of the foregoing means, and that El-Batrawi's assertions to the contrary lacked credibility. We conclude the district court did not abuse its discretion in concluding El-Batrawi was properly served, was evading service of process, and therefore was not blameless in his failure to timely appear.

### 2.    Meritorious Defense

El-Batrawi argues the district court should have granted his motion to set aside default because he had potentially meritorious defenses, namely that he did not engage in market manipulation, he gave full disclosure, he did not participate in the alleged misconduct, he had no scienter, and the plaintiffs would not be able to prove any of the claimed damages. The district court, citing Fink v. Swisshelm, 182 F.R.D. 630 (D. Kan. 1998), for support, concluded El-Batrawi did not provide any factual support for his allegation that he was merely a bystander to the alleged stock-loan fraud that

occurred, and accordingly, El-Batrawi had failed to establish the existence of a meritorious defense. El-Batrawi argues on appeal that the district court applied the incorrect legal standard in determining whether he had any meritorious defenses and misapplied the holding of Fink.

In Fink, the court concluded the defendant's motion to set aside default failed to make any effort to demonstrate a meritorious defense to the action. Fink, 182 F.R.D at 632. The Fink court observed that while the defendant's answer listed two affirmative defenses, "bald allegation[s] . . . without the support of facts underlying the defense, will not sustain the burden of the defaulting party to show cause why the entry of default should be set aside; the trial court must have before it more than mere allegations that a defense exists." Id. at 633. We agree.

Whether a meritorious defense exists is determined by examining "whether the proffered evidence 'would permit a finding for the defaulting party.'" Johnson, 140 F.3d at 785 (quoting Augusta Fiberglass Coatings, Inc. v. Fodor Contracting Corp., 843 F.2d 808, 812 (4th Cir. 1988) (per curiam)). "The underlying concern is . . . whether there is some possibility that the outcome . . . after a full trial will be contrary to the result achieved by the default." Augusta Fiberglass, 843 F.2d at 812 (quoting Charles Alan Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure § 2697 (2d ed. 1983)).

The record shows that while El-Batrawi offered up defenses, he did not provide a sufficient elaboration of facts or evidence to permit the district court to determine whether, if believed, the defenses were meritorious. Instead, the proffered defenses were nothing more than simple assertions unsupported by specific facts or evidence. The district court correctly concluded El-Batrawi did not provide minimally adequate factual support to illustrate the potential viability of his asserted defenses, and thus failed to establish the existence of a meritorious defense.

### 3.     No Prejudice

Finally, El-Batrawi argues vacating the default would not prejudice the MJK Trustee, because any burden to the MJK Trustee in having to actually prove his claims against El-Batrawi and obtain the $67.5 million judgment on the merits is clearly outweighed by El-Batrawi's own due process entitlement to defend himself against the claims.

The district court found between the entry of default against El-Batrawi in 2003 and his eventual appearance in June 2006, the MJK Trustee had conducted extensive discovery, engaged in exhaustive motion practice, and made comprehensive trial preparations. The district court, in observing the case had been litigated for many years, concluded that to allow El-Batrawi to appear at this advanced stage in the litigation would result in the MJK Trustee having to re-litigate the case against El-Batrawi, which would cause substantial prejudice to the MJK Trustee. The district court found El-Batrawi had every opportunity to defend himself in the action but declined to do so in a timely manner.

Of course delay alone, or the fact the defaulting party would be permitted to defend on the merits, are insufficient grounds to establish the requisite prejudice to the plaintiff. Johnson, 140 F.3d at 785. "Setting aside a default must prejudice plaintiff in a more concrete way, such as 'loss of evidence, increased difficulties in discovery, or greater opportunities for fraud and collusion.'" Id. (quoting Berthelsen v. Kane, 907 F.2d 617, 621 (6th Cir. 1990) (per curiam)). Applying this analysis to a case of this nature and magnitude demonstrates concrete prejudice.

This litigation involves complex stock loan transactions and necessarily involves numerous witnesses and voluminous documentary evidence. The MJK Trustee did not have the benefit of any discovery from El-Batrawi. The MJK Trustee's trial preparation was premised on the fact that a default had already been entered against El-Batrawi, and thus the MJK Trustee had no need to prepare for trial

-10-

as against El-Batrawi. Given the length of delay between the commencement of this action and El-Batrawi's appearance, and the amount of litigation that occurred in the case during the intervening years, the district court correctly determined setting aside the default would clearly result in increased difficulties in discovery given the amount of time that has elapsed; and the MJK Trustee would be substantially prejudiced in having to re-litigate its claims against El-Batrawi at this late stage of the proceedings.

El-Batrawi waited almost three years from the time default was entered to file his motion to set aside, and that motion appears to have only been prompted by the MJK Trustee's motion for default judgment. We find no abuse of discretion by the district court in denying El-Batrawi's motion to set aside the entry of default.

## B. Entry of Default Judgment

El-Batrawi argues it was a violation of his due process rights for the district court to enter a default judgment against him in the amount of $67.5 million for damages that El-Batrawi describes as unproven, uncertain, and unliquidated. El-Batrawi claims the record does not support the district court's findings that a sum of money even approximating $67.5 million is attributable to El-Batrawi's conduct in the alleged complaint.[9]

"It is a familiar practice and an exercise of judicial power for a court upon default, by taking evidence when necessary or by computation from facts of record, to fix the amount which the plaintiff is lawfully entitled to recover and to give judgment accordingly." Pope v. United States, 323 U.S. 1, 12 (1944). "The court may conduct hearings or make referrals . . . when, to enter or effectuate judgment, it needs

_____

[9]El-Batrawi's causation arguments are not before this court where El-Batrawi was in default and the district court correctly accepted the fact allegations of the complaint as true. See Everyday Learning Corp. v. Larson, 242 F.3d 815, 818 (8th Cir. 2001); Brown v. Kenron Aluminum & Glass Corp., 477 F.2d 526, 531 (8th Cir. 1973).

to . . . determine the amount of damages." Fed. R. Civ. P. 55(b)(2)(B). See also Am. Red Cross v. Cmty. Blood Ctr., 257 F.3d 859, 864 (8th Cir. 2001) ("When a default judgment is entered on a claim for an indefinite or uncertain amount of damages, facts alleged in the complaint are taken as true, except facts relating to the amount of damages, which must be proved in a supplemental hearing or proceeding." (quoting Everyday Learning Corp. v. Larson, 242 F.3d 815, 818 (8th Cir. 2001) (internal quotation marks omitted))). Once the amount of damages has been established, the court may enter judgment pursuant to the rule. The district court recognized it could hold an evidentiary hearing to determine the amount of damages, as requested by El-Batrawi, but deemed an evidentiary hearing unnecessary, finding each category of damages was supported by extensive documentary evidence.

A district court's findings regarding damages are reviewed for clear error. Pfanenstiel Architects, Inc. v. Chouteau Petroleum Co., 978 F.2d 430, 432 (8th Cir. 1992). We reject El-Batrawi's argument that a de novo review should be employed where, as here, the district court held no hearing on the issue of damages. The need for a hearing is within the sound discretion of the district court under Fed. R. Civ. P. 55(b)(2)(B). See Taylor v. City of Ballwin, Mo., 859 F.2d 1330, 1333 (8th Cir. 1988). As the authorities posited by El-Batrawi for a different standard are inapposite as they relate to fundamentally different procedural circumstances, we follow our established standard of review to determine if the damages findings by the district court are clearly erroneous. See Everyday Learning Corp., 242 F.3d at 819.

The district court found there were three categories of damages at issue for which El-Batrawi and the other defaulting defendants were jointly and severally liable: (1) losses associated with the stock-loan chains at issue (i.e. the cash collateral not returned to MJK through the GENI loan chain); (2) the costs of liquidating the

Estate of MJK Clearing, Inc.; and (3) the lost value of the MJK and Miller Johnson Steichen Kinnard, Inc. (MJSK) businesses.[10]

The MJK Trustee claimed: (1) the expert reports of Mary D. Jepperson and Dr. Robert Comment established losses associated with the stock-loan chains of $200 million; (2) losses associated with the value of MJK and MJSK, as set forth in the report of James R. Hitchner, established losses in the amount of $85 million; and (3) liquidation costs for the MJK estate, as substantiated in the proceedings and documents filed with the bankruptcy court in connection with the liquidation of the MJK estate, established losses in the amount of $50 million. The MJK Trustee asserted the total of these losses amounted to $335 million, and after accounting for the $267.5 million settlement, $67.5 in uncompensated damages remained.

The district court, in concluding these three categories of losses amounted to a total of $335 million, as requested by the MJK Trustee, found: (1) the expert reports of Jepperson and Dr. Comment established the losses associated with the stock-loan chains were $200 million; (2) the losses associated with the value of MJK and MJSK were set forth in the report of James Hitchner and amounted to $85 million; and (3) the cost of liquidating the MJK estate amounted to $50 million in damages. The district court concluded the Deutsche Bank SL defendants had recompensated the MJK Trustee for $267.5 million of these damages through the settlement agreement, and therefore only $67.5 million in uncompensated damages remained.

The district court, however, never referenced a specific portion of Jepperson's 64-page report in concluding the report established $200 million in stock-loan chain losses. The district court concluded the cost of liquidating the MJK estate amounted to $50 million; again, however, neither the MJK Trustee nor the district court

---

[10]MJSK was a brokerage business comprised of the full service operations of MJK. The losses sustained by MJK necessarily impacted the value of MJSK.

referenced any specific document in the bankruptcy proceedings to support $50 million in liquidation costs.

Other than general reference to the experts' reports, the district court did not identify with any specificity how it reached a loss amount of $200 million due to the stock-loan losses. Hitchner's report found a maximum loss value of $84 million. Without articulating any basis for deviating from the maximum amount of damages found in Hitchner's report, the district court concluded the lost value of businesses was $85 million. Without identifying upon which bankruptcy filing it relied in assessing the proper amount of liquidation costs, the district court concluded liquidation costs were $50 million, the exact amount requested by the MJK Trustee. It is not clear on this record what the basis is for the discrepancy between the value of the damages as set forth in the reports and the bankruptcy pleadings and the amount of damages sought by the MJK Trustee, and ultimately awarded by the district court.

The MJK Trustee has not extensively documented the mathematical calculation used to reach the final amount in each category of damages requested from the district court. The district court did not state the basis upon which each category of damages was calculated, nor did it refer to any specific portions of the experts' reports, or the bankruptcy proceedings, in support of the amount of each category of damages.

The district court's generic reference to evidentiary support for the damages determination leaves this court unable to discern the basis for that court's conclusions, and our own review of the record reveals inconsistencies between the supporting documents and the damages award. Because we have no adequate record for the evaluation of the district court's damages determinations, we conclude remand is necessary. See Ackra Direct Mktg. Corp. v. Fingerhut Corp., 86 F.3d 852, 857 (8th Cir. 1996) ("[W]e may remand when the lack of findings by the district court would substantially hinder our review.").

## III. CONCLUSION

For the reasons stated, we affirm the denial of El-Batrawi's motion to set aside default. We vacate the default judgment and remand this case with instructions for the district court to make findings regarding the evidentiary support and any necessary calculations for any damage award it may enter. In this posture, and recognizing the discretion inherent in Federal Rule of Civil Procedure 55(b)(2), we state no opinion at this time as to the need for or nature of any evidentiary hearing.[11]

---------------------------------

---

[11]Foregoing an evidentiary hearing may constitute abuse of discretion when the existing record is insufficient to make necessary findings in support of a default judgment. See, e.g., KPS & Assocs., Inc. v. Designs By FMC, Inc., 318 F.3d 1 (1st Cir. 2003) (holding "a claim is not a sum certain unless there is no doubt as to the amount to which a plaintiff is entitled as a result of the defendant's default" and concluding the district court abused its discretion by entering default judgment damages in the amount requested in the complaint without conducting an evidentiary hearing or making further inquiry where the requested amount contained unexplained discrepancies and computation errors, and thus was internally inconsistent with the supporting documentation).