# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-1772

_____

KD, Parent, Natural Guardian and Next Friend of minor LD; JD, Parent, Natural
Guardian and Next Friend of minor LD

*Plaintiffs - Appellants*

v.

Douglas County School District No. 001, also known as Omaha Public Schools;
Daniel Bartels

*Defendants - Appellees*

Joe Doe; Jane Doe

*Defendant*s

Brian Robeson

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: March 18, 2021
Filed: June 16, 2021

_____

Before SHEPHERD, ERICKSON, and KOBES, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

This case arises from the sexual abuse of LD (a 13-year-old, female 7th-grade student) by her male Douglas County Nebraska Public School District teacher, Brian Robeson. After Robeson was convicted of first-degree sexual assault, KD and JD, LD's parents, brought this action against the Douglas County Nebraska Public School District (the District); Robeson; Daniel Bartels, the school principal; and Joe and Jane Doe. The district court[1] granted summary judgment in favor of the District and Bartels; entered a default judgment against Robeson; denied KD and JD's request for a jury trial on the issue of damages against Robeson; and awarded damages of $1,249,540.41 against Robeson. KD and JD now appeal: the district court's grant of summary judgment; the order denying their request for a jury trial on the issue of damages against Robeson; and the amount of damages. Having jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

I.

From August 14, 2013, to May 22, 2015, LD attended 7th and 8th grade at Alfonza Davis Middle School in Douglas County. During her 7th-grade year, LD was a student in Robeson's algebra and "Take Flight" classes.

In April 2014, a school staff member notified Bartels that Robeson was mentoring LD, one-on-one, in his classroom. All mentorship relationships within the District were facilitated by the TeamMates program, and this program required same-sex mentor-mentee pairings. At this time, Bartels informed Robeson that Robeson could not mentor LD without permission from LD's parents and without acceptance into the TeamMates program. Robeson subsequently emailed JD, LD's mother, providing updates about his mentorship of LD and requesting that JD and KD, LD's father, sign the requisite TeamMates program paperwork permitting

---

[1]The Honorable Laurie Smith Camp, United States District Judge for the District of Nebraska, now deceased.

Robeson to continue mentoring LD into LD's 8th grade year. Robeson included Bartels on this email. At the beginning of LD's 8th grade year (in the fall of 2014), Bartels asked Robeson if Robeson had been accepted into the TeamMates program, to which Robeson responded that he had been accepted. At some point, LD's parents gave consent for Robeson to have lunchtime meetings with LD, and Bartels instructed Robeson that all meetings with LD were to take place in the administrative offices.

In late April 2014, Robeson attended a school-sponsored, weekend field trip. While on that field trip, Robeson emailed Bartels and attached photographs of himself with students. LD was included in those photographs. Below the email containing photographs were pages of dialogue between Robeson and LD in which Robeson expressed his affection for LD. Robeson used language such as "sweetheart" and "Sunshine," and Robeson told LD, "I've never had a student mean this much to me." However, at this time, Bartels only noted the field trip photographs and did not notice the email chain containing dialogue between Robeson and LD.

In the fall of 2014, Jennie Meyer, a school employee, noticed LD (then an 8th grader) and several friends visiting the 7th-grade floor on which Robeson taught. Meyer reported this to the administration. Bartels responded by contacting JD, LD's mother, to let her know that LD was visiting Robeson's floor. On a separate occasion, Meyer found LD in Robeson's classroom, alone with Robeson and crying. At this time, Meyer made a second report to the administration. In response, the assistant principal visited Robeson's classroom and asked Robeson why he was alone with LD and why LD was crying. Robeson indicated that everything was okay, and LD continued to her next class. In November 2014, Bartels noticed LD and Robeson alone in Robeson's classroom eating lunch. Bartels stopped and asked the pair what they were doing, to which they responded that they were conducting a mentoring session. Bartels reminded them that all mentoring sessions were to take place in the administrative offices. Later that afternoon, Bartels met with Robeson

individually and again reminded him that any mentoring sessions must take place in the administrative offices.

Later that school year, the school counselor told Bartels that a coach saw Robeson tie LD's shoe in the school hallway with other coaches and students present. When Bartels confronted Robeson about this, Robeson denied tying LD's shoe. Then, in March 2015, Bartels found an anonymous note in his school mailbox which read: "I find it curious that LD is absent on the same day as Mr. Robeson." Bartels showed this note to the assistant principal, but because neither administrator could determine who the note's author was, Bartels threw the note away. Nevertheless, Bartels called KD to determine the reason for LD's absence. KD indicated that LD was ill and at home for the day.

In April 2015, Bartels received a report from Chantalle Galbraith, a paraprofessional at the school, indicating that Robeson had grabbed LD's phone from the back pocket of her pants in the presence of other students and coaches. Bartels had recently hosted a professional development program with the school's faculty and staff in which he discussed the impropriety of possessing student property. When Galbraith voiced concern about Robeson grabbing LD's phone, she indicated that this was a violation of the professional development lesson Bartels had recently taught. When Bartels asked Robeson about this, Robeson admitted that he had grabbed LD's phone; Bartels warned Robeson against engaging in this type of behavior with students. Later that spring, Galbraith found LD and Robeson eating together in Robeson's classroom with the lights dimmed. After Galbraith reported this to Bartels, Bartels immediately dispatched the school's security officer to the classroom. However, when the officer arrived, the classroom appeared to be empty. Regardless, Bartels later met with Robeson, admonished Robeson for this behavior, and counseled Robeson regarding appropriate interactions with students.

In May 2015, a teacher and the school counselor copied Bartels on an email chain in which they expressed their concern about the amount of time that Robeson was spending with LD. The counselor agreed to call KD and JD to offer additional

resources for difficulties LD was experiencing with her friendships and to alert them of the attention Robeson was giving LD. That same month, the teacher also sent a photo of Robeson hugging another student for a prolonged period of time. In response, Bartels thanked the teacher and indicated that if she believed Robeson was engaging in inappropriate sexual conduct with students, she should report Robeson to Child Protective Services (CPS). The teacher reported Robeson to CPS, and in her report, she expressed concern about Robeson's behavior toward LD. Specifically, the teacher described witnessing Robeson "poking [LD] in the stomach in a hallway as well as touching her shoulder as if he was giving her a massage." CPS indicated that it would forward the report to the Omaha Police Department. The District's human resources department instructed Bartels to meet with Robeson to discuss the expectations of Robeson's employment, including his behavior towards students. Bartels met with Robeson in June of 2015. Then, in December 2015, the District was notified of Robeson's arrest for his sexual assault of LD. At that time, the District terminated Robeson's employment contract, deferred its then-ongoing investigation of Robeson (for conduct unrelated to LD) to the police department, and delivered a letter to Robeson evidencing the termination of his employment.

KD and JD (Appellants) filed a complaint with the district court, naming the District, Bartels, Robeson, and Joe and Jane Doe as defendants. Appellants brought six claims: (1) a 20 U.S.C. § 1681 (Title IX) claim against the District; (2) a 42 U.S.C. § 1983 claim against Bartels, Robeson, and Joe and Jane Doe; (3) a Nebraska Political Subdivisions Tort Claims Act claim against the District, Bartels, and Joe and Jane Doe; (4) a battery claim against Robeson; (5) an intentional infliction of emotional distress claim against Robeson; (6) and an aiding and abetting intentional infliction of emotional distress claim against Bartels and Joe and Jane Doe.[2] Appellants included a jury trial demand. After discovery, the District and Bartels each moved for summary judgment, and the district court granted both motions.

[2]The district court dismissed Appellants' claims against the Doe defendants because Appellants failed to name those defendants. Appellants do not appeal this dismissal, and therefore we do not address Appellants' claims against the Doe defendants.

Robeson failed to enter his appearance in the case, and the district court entered a default judgment against Robeson. The district court held a damages hearing, absent a jury, and awarded Appellants $1,249,540.41 in damages against Robeson.

## II.

Appellants first argue that the district court erred in granting the District's and Bartels's summary judgment motions. "We review *de novo* a district court order granting summary judgment, viewing the evidence in the light most favorable to the non-moving party, and drawing all reasonable inferences in their favor." K.C. v. Mayo, 983 F.3d 365, 368 (8th Cir. 2020). Summary judgment is appropriate where no genuine dispute of material fact exists. See Turner v. XTO Energy, Inc., 989 F.3d 625, 627 (8th Cir. 2021); Fed. R. Civ. P. 56(a). "To avoid summary judgment, the non-movant must make a sufficient showing on every essential element of its claim on which it bears the burden of proof." P.H. v. Sch. Dist. of Kan. City, 265 F.3d 653, 658 (8th Cir. 2001) (citation omitted).

## A.

Title IX, subject to several exceptions which are inapplicable here, prohibits discrimination on the basis of sex in educational programs or activities receiving Federal financial assistance. 20 U.S.C. § 1681. Discrimination on the basis of sex encompasses sexual harassment of a student by a teacher. Du Bois v. Bd. of Regents of Univ. of Minn., 987 F.3d 1199, 1203 (8th Cir. 2021) (citing Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 281-82 (1998)). Further, Title IX creates a private right of action that the United States Supreme Court and this Court have long recognized. See, e.g., Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 639 (1999); Wolfe v. Fayetteville Sch. Dist., 648 F.3d 860, 864 (8th Cir. 2011). However:

> a private plaintiff is not entitled to damages under Title IX for a
> teacher's sexual harassment unless an official of the grant recipient with

authority to address harassment complaints had actual notice of the teacher's alleged misconduct, and the official's inadequate response amounted to deliberate indifference to the discrimination.

Cox v. Sugg, 484 F.3d 1062, 1067 (8th Cir. 2007) (citing Gebser, 524 U.S. at 290-92).[3]

Relatedly, a supervisory school administrator may be held liable for a Title IX violation pursuant to 42 U.S.C. § 1983. K.C., 983 F.3d at 368. "Where, as here, the complaint involves allegations against school officials brought under both Title IX and § 1983, 'our [C]ourt has held that an official in these circumstances must have "actual notice" of the alleged "sexual harassment" or "sexual abuse" to meet the standard for liability.'" Id. (citations omitted); see also Doe v. Flaherty, 623 F.3d 577, 584 (8th Cir. 2010) ("Where both the Title IX and the § 1983 action allege discrimination by the same policymaking official and are premised on the same facts, Cox[, 484 F.3d 1062] adopted comparable notice standards to prevent the § 1983 action from trumping 'the Supreme Court's careful crafting of the implied statutory damage action under Title IX.' . . . Accordingly, our [C]ourt has held that an official in these circumstances must have 'actual notice' of the alleged 'sexual harassment' or 'sexual abuse.'" (citation omitted)).

The actual notice standard is quite onerous, and favoritism towards the student; inordinate time spent with the student; unprofessional conduct towards the student; and vague complaints about the teacher's behavior toward the student (which do not *expressly* allege sexual abuse of that student) fall short of creating actual notice. See, e.g., Gebser, 524 U.S. at 291 (finding that "a complaint from parents of other students charging only that [the teacher] had made inappropriate comments during class . . . was plainly insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student");

---

[3]The Supreme Court has previously identified school principals as persons with the authority to address harassment complaints, see, e.g., Plamp v. Mitchell Sch. Dist., 565 F.3d 450, 457 (8th Cir. 2009), and here the parties do not dispute that Bartels had such authority.

Flaherty, 623 F.3d at 585 (finding that "inappropriate" and "suggestive" text messages could not impute actual notice because the messages "did not go so far as to suggest actual sexual conduct or sexual abuse"); P.H., 265 F.3d at 659 (explaining that without reports of sexual contact or suspected sexual contact between teacher and student, the teacher's "conduct of spending too much time with [the student] causing [the student] to be absent from or tardy to classes" did not establish actual notice of ongoing sexual abuse). Therefore, in order to survive the District's and Bartels's motions for summary judgment, Appellants needed to present "a genuine issue as to whether [Bartels] had actual notice of sexual abuse or harassment and failed to adequately respond." See K.C., 983 F.3d at 368.[4]

Although Robeson's abuse of LD was unquestionably despicable, Appellants failed to present any evidence that Bartels had actual notice of that abuse, making summary judgment appropriate. See id. Bartels received complaints from faculty and staff members about LD visiting Robeson's floor; LD alone with Robeson in his classroom at lunch time; Robeson tying LD's shoelace in the hallway; Robeson and LD being absent from school on the same day; Robeson grabbing LD's phone out of the back pocket of her pants; and the amount of time that Robeson and LD were spending together. However, none of these complaints alleged sexual abuse. See, e.g., Flaherty, 623 F.3d at 585. Further, even when Bartels "investigated" complaints that he received, his investigation did not actually place him on notice of Robeson's sexual abuse of LD. For example, in response to a complaint that LD and Robeson were eating lunch in Robeson's classroom with the lights dimmed, Bartels sent the school's security officer to the classroom. When the officer arrived, however, the classroom appeared to be empty. Similarly, in response to a complaint

---

[4]Appellants support their Title IX argument with the contention that because Bartels had actual notice, the District also had actual notice. Appellants do not contend that other District employees with the authority to address harassment complaints had actual notice. As a result, our inquiry for Appellants' Title IX and § 1983 claims is a singular one: whether a genuine issue of fact exists as to whether Bartels had actual notice of Robeson's misconduct. See K.C., 983 F.3d at 368.

that Robeson and LD were absent from school on the same day, Bartels contacted LD's father, who assured Bartels that LD was ill and at home.

Appellants also point to the District's personnel policies, directing us to a specific provision which requires a "prompt, adequate, reliable, thorough, and impartial investigation" where the District "knows or reasonably should know about possible harassment." However, to find the District and Bartels liable under Title IX and § 1983, respectively, based on such a provision would allow the District to transform this Court's and the Supreme Court's actual notice standard into one of mere negligence (i.e., "knows or reasonably should know") simply through its policies. Doe v. Dardanelle Sch. Dist., 928 F.3d 722, 725 (8th Cir. 2019) (explaining that such claims cannot be predicated on mere negligence). After a careful review of the record, we find that the record fails to support Appellants' claim that Bartels had actual notice of Robeson's abuse of LD, and we need not reach the deliberate indifference prong. Therefore, summary judgment in favor of the District (on Appellants' Title IX claim) and in favor of Bartels (on Appellants' § 1983 claim) was appropriate.[5]

---

[5]The district court found that Appellants' claim against Bartels was against him in his official, rather than individual, capacity. We agree. "This [C]ourt has held that, in order to sue a public official in his or her individual capacity, a plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity." Alexander v. Hedback, 718 F.3d 762, 766 n.4 (8th Cir. 2013) (citation omitted). Here, Appellants did not "expressly and unambiguously" name Bartels in his individual capacity; instead, Appellants' complaint identifies Bartels as "an administrator" who "at all relevant times" was "act[ing] as Principal." R. Doc. 1, at 5. Further, "because Title IX only prohibits discrimination by federal grant recipients, a supervisory school official may not be sued in his individual capacity, either directly under Title IX or under § 1983 based upon a violation of Title IX." Cox, 484 F.3d at 1066. Therefore, we treat Appellants' § 1983 claim against Bartels as being against Bartels in his official capacity.

B.

Next, the district court did not err by granting summary judgment in favor of the District and Bartels on Appellants' Nebraska Political Subdivisions Tort Claims Act (the PSTCA) claim. "Under the PSTCA, a political subdivision has no liability for the torts of its officers, agents, or employees, 'except to the extent, and only to the extent, provided by the [PSTCA].'" Edwards v. Douglas Cnty., 953 N.W.2d 744, 750 (Neb. 2021) (alteration in original) (citation omitted). In Nebraska, "[t]he [PSTCA] is the exclusive means by which a tort claim may be maintained against a political subdivision or its employees," Jessen v. Malhotra, 665 N.W.2d 586, 590 (Neb. 2003), because it "allows a limited waiver of a political subdivision's sovereign immunity with respect to certain, but not all, types of tort actions," Rutledge v. City of Kimball, 935 N.W.2d 746, 750 (Neb. 2019). However, the PSTCA sets forth a list of claims that are "excepted" from the PSTCA's waiver of sovereign immunity, and where a plaintiff attempts to bring one of those claims against a political subdivision, that political subdivision is immune from suit. Rutledge, 935 N.W.2d at 750. One exception, which the district court found was present in this case, is "sometimes referred to as the 'intentional torts exception.'" Id. (citation omitted). Whether this "intentional torts" exception applies is a jurisdictional question which we must decide before moving to the nonjurisdictional merits of Appellants' PSTCA claim. Lambert v. Lincoln Pub. Schs., 945 N.W.2d 84, 89 (Neb. 2020).[6]

"[W]hen a tort claim against the government seeks to recover damages for personal injury or death stemming from an assault, the claim necessarily 'arises out of assault' and is barred by the intentional tort [exception] under the PSTCA." Edwards, 953 N.W.2d at 756. In Edwards, the plaintiff brought a claim against the

---

[6]The district court found that the "discretionary function" exception also applied because the District's and Bartels's decisions on which Appellants' claims are premised were discretionary functions. R. Doc. 170, at 25. However, because we find that the "intentional torts" exception applies here, rendering the District and Bartels immune from suit, we need not address this second possible exception.

county for its failure to promptly dispatch first responders via its 911 service which, the plaintiff alleged, allowed her to be sexually assaulted. See generally id. The Nebraska Supreme Court held that the county was immune because despite the plaintiff's "artful pleading," her sexual assault was an intentional tort to which the PSTCA's intentional tort exception applied. Id. at 757. Similarly, here, the District and Bartels are immune from tort liability under the PSTCA because Appellants' claim against them arises out of Robeson's sexual assault of LD. This sexual assault, like the assault examined in Edwards, is an intentional tort to which the PSTCA's intentional tort exception applies. Therefore, summary judgment in favor of the District and of Bartels was appropriate.

C.

Finally, the district court did not err in granting summary judgment in favor of Bartels on Appellants' aiding and abetting intentional infliction of emotional distress claim. Under Nebraska law, to establish a claim for intentional infliction of emotional distress, a plaintiff must demonstrate:

> (1) intentional or reckless conduct (2) that was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community and (3) that the conduct caused emotional distress so severe that no reasonable person should be expected to endure it.

Roth v. Wiese, 716 N.W.2d 419, 431 (Neb. 2006). Further, provided there is an underlying, actionable tort, see, e.g., Salem Grain Co. v. Consol. Grain & Barge Co., 900 N.W.2d 909, 924 (Neb. 2017), civil abetting liability arises for "one who counsels, commands, directs, advises, assists, or aids and abets another individual in commission of a wrongful act or tort," see, e.g., Bergman v. Anderson, 411 N.W.2d 336, 340 (Neb. 1987). The Nebraska Supreme Court employs the same lenient aiding and abetting standard in civil tort claims as it does in criminal actions: "mere

-11-

encouragement or assistance" is sufficient to impose liability. <u>Bergman</u>, 411 N.W.2d at 341.

Appellants brought an intentional infliction of emotional distress claim against Robeson, and after Robeson failed to enter an appearance or otherwise defend the claim, the district court entered a default judgment against him. We accept as true, without deciding, Appellants' claim that Robeson committed the tort of intentional infliction of emotional distress. <u>See, e.g.</u>, <u>Salem Grain Co.</u>, 900 N.W.2d at 924 (requiring an underlying, actionable tort). However, Appellants have presented no evidence that Bartels "encourage[d] or assist[ed]" Robeson's abuse of LD. <u>See</u> <u>Bergman</u>, 411 N.W.2d at 341. To the contrary, Bartels met with Robeson to express his concern about Robeson's behavior; required Robeson and LD to meet in the administrative offices, rather than in Robeson's classroom, for all mentoring sessions; contacted LD's mother when he learned that, as an 8th grader, LD was visiting the 7th-grade floor on which Robeson taught; contacted LD's father when he learned that LD and Robeson were absent on the same day; directed a school security officer to visit Robeson's classroom after receiving a report that LD and Robeson were eating in the room with the lights dimmed; and directed concerned faculty members to CPS after advising them that, if they suspected abuse, they should report that abuse. Nothing in the record, even when viewed in the light most favorable to Appellants, indicates that Bartels encouraged or assisted Robeson in inflicting emotional distress on LD. Therefore, the district court did not err in granting summary judgment.

## III.

Appellants moved for a default judgment after Robeson failed to file an answer or other responsive pleading in the case, and in that motion, Appellants renewed their jury demand. After entering a default judgment against Robeson, the district court held a hearing on the issue of damages without empaneling a jury. The district court then awarded damages totaling $1,249,540.41 to Appellants. Appellants now argue that the district court erred by denying their jury demand on

the issue of damages. "Whether a party has a right to trial by jury in federal court is a question of law subject to de novo review." Ind. Lumbermens Mut. Ins. Co. v. Timberland Pallet & Lumber Co., 195 F.3d 368, 374 (8th Cir. 1999).

Appellants argue that they had a right to a jury trial on the issue of damages following the default judgment under both Federal Rule of Civil Procedure 55(b)(2) and the Seventh Amendment. However, Rule 55(b)(2) merely preserves "any federal statutory right to a jury trial," Fed. R. Civ. P. 55(b)(2), and Appellants do not direct this Court to any federal statute creating such a right. Moreover, we have previously explained that "[i]t is a familiar practice and an exercise of judicial power for a court upon default, by taking evidence when necessary or by computation from facts of record, to fix the amount which the plaintiff is lawfully entitled to recover and to give judgment accordingly." Stephenson v. El-Batrawi, 524 F.3d 907, 915 (8th Cir. 2008) (citation omitted). Rule 55(b)(2) entrusts the district court with the discretion to decide if a hearing on the issue of damages is necessary following default judgment, and nothing in Rule 55(b)(2) mandates that a jury determine the amount of damages, should the district court elect to hold a hearing. See Fed. R. Civ. P. 55(b)(2).

Appellants also argue that the Seventh Amendment supplies this right, explaining that their battery claim against Robeson is of the type of claim heard by a jury at common law. See U.S. Const. amend. VII (preserving the right to trial by jury for "[s]uits at common law, where the value in controversy shall exceed twenty dollars"). Even accepting that the underlying battery claim is of the type heard by a jury at common law, we find that nothing in the Seventh Amendment's language provides for a right to a jury trial on the issue of damages following a default judgment. Appellants direct us to Parsons v. Bedford, Breedlove & Robeson, 28 U.S. (3 Pet.) 433 (1830), and Brown v. Van Braam, 3 U.S. (3 Dall.) 344 (1797), in which the Supreme Court analyzed the Seventh Amendment, elaborating on its parameters. However, we find nothing in this case law to suggest that a Seventh Amendment right to a jury on the issue of damages following a default judgment exists.

-13-

Further, our sister circuits have uniformly found that no right to a jury trial on the amount of damages following entry of default judgment exists. See, e.g., Olcott v. Del. Flood Co., 327 F.3d 1115, 1124 (10th Cir. 2003); Sells v. Berry, 24 F. App'x 568, 571-72 (7th Cir. 2001) (per curiam); Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit Int'l, Inc., 982 F.2d 686, 692 n.15 (1st Cir. 1993); Dierschke v. O'Cheskey (In re Dierschke), 975 F.2d 181, 185 (5th Cir. 1992); Adriana Int'l Corp. v. Thoeren, 913 F.2d 1406, 1414 (9th Cir. 1990); cf. KCI USA, Inc. v. Healthcare Essentials, Inc., 801 F. App'x 928, 936-37 (6th Cir. 2020) (cautioning that default judgments infringe upon a litigant's Seventh Amendment right and thus should be entered sparingly); Wilson v. Volkswagen of Am., Inc., 561 F.2d 494, 503-04 (4th Cir. 1977) (same).

Therefore, after a searching review of the Federal Rules of Civil Procedure, the Seventh Amendment, the Supreme Court's and this Court's jurisprudence, and our sister circuits' decisions on this issue, we join many of those circuits in finding that no right to a jury trial on the issue of damages following a default judgment exists. And because we find that this right does not exist, we also find that the district court did not err.

IV.

Finally, Appellants allege that the district court erred by awarding $1,249,540.41 in damages because, according to Appellants, that award was "inadequate." Appellants' Br. 51. The amount of damages awarded is a finding of fact, so our review of that award in a non-jury case is subject to a "clearly erroneous" standard of review. See Gonzalez v. United States, 681 F.3d 949, 952 (8th Cir. 2012); see also Webb v. Arresting Officers, 749 F.2d 500, 501 (8th Cir. 1984) ("[W]e continue to adhere to the view that the inadequacy or excessiveness of an award is basically a matter for the trial court. We have intervened only in those rare situations where we are pressed to conclude that there is 'plain injustice' or a 'monstrous' or 'shocking' result." (citation omitted)). This is an exacting standard, and we will not reverse the district court unless we are "left with the definite and firm conviction

-14-

that a mistake has been committed." United States v. Dock, 967 F.3d 903, 905 (8th Cir. 2020) (citation omitted).

Appellants have not offered anything that leaves us with a "definite and firm conviction" that the district court made a mistake in its damage award. See id. Appellants rely primarily on out-of-circuit and unpublished cases, and they do not cite anything in the record indicating the award was inadequate. Appellants point to evidence that LD will need therapy throughout her life, as well as to the "risks for difficulties in adult relationships, parent-child relationships, and other interactions" LD will face in adulthood. Appellants' Br. 51. We accept Appellants' position that Robeson's abuse may have a lasting effect on LD, but absent any explanation as to how or why the district court's damage award was clearly erroneous, we will not upend that award. Therefore, we find that the district court did not err. Additionally, for the reasons discussed supra Section III., we do not find persuasive Appellants' argument that the district court erred because the issue of damages "should have been determined by a jury." Appellants' Br. 51.

V.

For the reasons discussed above, we affirm.

_____